COMMONWEALTH *vs.* LAWYER JOHNSON.

Suffolk.    April 6, 1976. — March 18, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Homicide.    Practice, Criminal,* Charge to jury, Argument by prosecutor.    *Evidence,* Testimony of defendant at earlier trial, Presumptions and burden of proof, Relevancy and materiality, Admissions.  *Constitutional Law,* Admissions and confessions.    *Jury and Jurors. Witness.*

A verdict of guilty of murder in the second degree was not so against the weight of the evidence as to warrant relief under G. L. c. 278, § 33E.  [189-191]
At the trial of an indictment for murder in the first degree, evidence warranted the judge's denial of the defendant's motion for a directed verdict in so far as the indictment charged murder.  [191-192]
Taken as a whole, the charge to the jury at a murder trial contained no material error despite the judge's use of the word "presumption" in respect to the intentional use of a deadly weapon as probative of malice.  [192]
Where an error leading to the reversal of a defendant's previous trial for murder had no connection with his election to testify at that trial, there was no error at a subsequent trial for the same crime in allowing the Commonwealth to introduce a statement with respect to a portion of the defendant's testimony at the previous trial.  [192-194]

---

Commonwealth v. Johnson.

Where a police officer who was on ordinary patrol, not pointed par-
ticularly at finding the defendant, approached him and asked his
name and address, there was no custodial interrogation requiring
Miranda warnings. [194-195]
At a murder trial, the judge did not abuse his discretion in refusing to
allow the defendant to introduce in evidence a Superior Court de-
fault warrant which was outstanding against the defendant with re-
spect to another offense when he was arrested for murder; even if
the warrant should have been admitted to meet an inference of con-
sciousness of guilt that might be drawn from the defendant's false
answers to the arresting officer, any resulting error was not preju-
dicial. [195-196]
Conduct of the prosecutor at a murder trial did not require a mistrial
or a reversal of the conviction. [196-198]

INDICTMENT found and returned in the Superior Court
on February 9, 1972.

Following the decision reported in 365 Mass. 534 (1974)
the case was tried before *Abrams*, J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*John G. S. Flym* for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for
the Commonwealth.

KAPLAN, J.  The defendant Lawyer Johnson, found
guilty by a jury on June 1, 1972, of the murder in the first
degree of James Christian, appealed to this court from the
judgment of conviction and from an order denying a new
trial. This court on July 1, 1974, reversed the judgment
and set aside the verdict on the ground that the trial judge
had committed error in refusing to take measures to order,
induce, or compel a prosecution witness, Kenneth Myers,
to identify two persons who might, if produced, furnish
significant information about the crime. Following the re-
versal, the defendant was again put to trial on the same
indictment charging murder in the first degree. On No-
vember 16, 1974, a Suffolk County jury, after nine days
of trial before them, brought in a verdict of murder in the
second degree. The judgment of conviction entered thereon
is the subject of the present appeal under G. L. c. 278,
§§ 33A-33G.

Commonwealth *v.* Johnson.

An outline of the case appears in the opinion on the previous appeal (*Commonwealth* v. *Johnson,* 365 Mass. 534, 535-539 [1974]) to which the reader is referred. For present purposes we may say that at the trial here under review the prosecution in effect asked the jury to believe, and they evidently did believe, the nub of Myers's testimony under direct examination corresponding (though with differences) to a statement introduced at the first trial which he gave the police on December 8, 1971, the day after the homicide (see 365 Mass. at 537). Myers, a black youth, said that about 4 P.M., December 7, he saw the victim, a white man, enter 71 Prentiss Street in Roxbury, one of the apartment houses in the Mission Hill project. Myers followed the victim into the hallway; the victim asked Myers whether he knew a "Robinson"; Myers said he did not. As Myers left and reached the steps outside, he faced two black men — the defendant Johnson (whom he knew well) and Willie Bennett (as later indicated). One of them said, in effect, they were going to take or get that man and did he, Myers, want to help. It is not indicated that Myers replied. The victim, having emerged onto the porch or landing, found himself blocked in front by the defendant and at his back by Bennett, with Myers to the side or rear. The victim drew a gun but apparently hesitated. The defendant drew his gun and shot the victim twice at very close range, one bullet lodging in the victim's skull (and resulting in his death), the second passing through the front of his face, drilling a hole in the window of a ground floor apartment, and lodging in the wall of a room there. The defendant fled on Prentiss Street; Bennett ran to the rear through the building; Myers picked up the victim's gun where it had fallen, put it in a paper bag lying nearby, ran on Prentiss Street and entered the 61 Prentiss Street apartment house, went up the stairs to the roof, secreted the bag with the gun there, and went back to the scene where, by this time, a crowd was gathering.

To continue with the framework of the prosecution's case: On the night of December 15 the defendant was

found at the Sugar Shack, a Boston night club, by George Vest, an officer in plain clothes. When asked, the defendant gave a false name and address, and was immediately arrested on the murder charge.

The defendant was confined with Alvin Franklin in the Charles Street jail from about December 16. The triers could believe from Franklin's testimony that the defendant told Franklin that in attempting to rob the victim he had shot and killed him, and that Bennett and Myers were there at the time.

We shall fill in more of the picture as we discuss the several claims of error, but first we should mention the disclosures by Myers at the second trial which he was permitted to withhold in his testimony at the first. Asked at the first trial on cross-examination to name the man who stood with the defendant on the porch of 71 Prentiss Street, Myers had refused an answer. Now, under further pressure, he named Willie Bennett. But Bennett did not appear at either trial (however, as already indicated, he had in fact been named by Franklin at the first trial). Myers had stated at the first trial that just before the criminal event his girl friend accompanied him from Paul's Foodland on Parker Street to the vicinity of 71 Prentiss Street and then proceeded on her own, but he refused on cross-examination to name her, except to say that she was not Marlene (Marylin) Mack (who lived with her mother at 71 Prentiss Street). Now he admitted the identity. When Miss Mack testified as a witness for the defense at the second trial, she said she was a friend (but not the "girl friend") of Myers, but placed a meeting with Myers between 1 and 2 P.M. on December 7 at a store on Parker Street, whence, she said, they walked to the Mack apartment where Myers had a glass of water. She said she was not with him after that hour.[1]

---

[1] Miss Mack also said she was in the Mack apartment at the time of the shooting and on coming down the stairs saw Gary Pritchett (mentioned below) at the scene.

1. The trial judge denied the defendant's motion to set the verdict aside as against the weight of the evidence. The same relief is now requested of us under G. L. c. 278, § 33E.

There is argument, first, that the physical evidence of the course of the bullets, as it might be plotted on diagrams or maps of the place drawn by an architect, rendered unbelievable the details of Myers's story of the encounter on the landing outside 71 Prentiss Street. The jury could have found the physical demonstration quite unconvincing, as it assumed more or less fixed locations for the actors contrary to Myers's testimony which described an episode characterized by movement and fluidity.

The defendant attacks the veracity of the principal witnesses for the prosecution. Their trustworthiness was certainly questionable. Myers, with a criminal record, and himself not clear of suspicion of the homicide, was a difficult and reluctant witness. He gave a statement on December 7 intended to set the police on a false trail (see 365 Mass. at 535-536). His statement of December 8 and similar testimony, however, drew confirmation from the fact that he actually led the police to the gun, proved later to be the victim's, on the roof of 61 Prentiss Street. At trial some of Myers's direct testimony was not congruent with his prior testimony, but the deviations could be taken as inessential and as occasioned both by the fleeting character of the happenings described and by some loss of memory over time. On cross-examination Myers was nominally acquiescent in some of defense counsel's suggestions at variance with his direct testimony, but the jury could surmise that he was not loath to leave the semblance, at least, of an escape hatch for the defendant. A like comment could be made about Franklin's behavior on cross-examination in which he was not resistant to the suggestion that his memory might have been at fault so that he was perhaps imputing to the defendant an account he initially had received from Myers. We should add that Myers and Franklin were under pressure of their forthcoming trials on criminal charges at which they could hope

that any past cooperation might earn them favor from the prosecutor. In each instance, then, there was a mélange of motives. But assessment of the reliability of such witnesses is peculiarly and traditionally within the range of exclusive competence of the jury.

Similarly it was for the jury to assess the credit to be given the testimony of Gary Pritchett, the most material of the witnesses offered by the defense.[2] He had not appeared at the first trial but gave an affidavit and testified in support of the motion for a new trial previously denied (see 365 Mass. at 549-550). Pritchett said he heard gunshots and then saw three black men running from 71 to 61 Prentiss Street. Knowing well both Myers and the defendant, he said he recognized Myers as one of the three but not the defendant. He said Myers stopped before reaching No. 61, but the other two entered. It might be accepted that Pritchett was near the scene when the shots were fired, and he might have been the source of information to the police about Myers. If it were accepted that he was trying to tell the truth, there would still be considerable doubt whether from his position he could have made the observations he testified to, including the negative observation about the defendant, with any substantial claim to accuracy. His testimony as a whole was clouded by suspicion that he was shaping his testimony to help save a friend, for it was not easy to accept his assertion that through the first trial, a half year after the homicide, he had not known that anyone had been charged with the crime.[3]

Under our decisions there is no adequate basis for setting aside the jury's verdict. See *Commonwealth* v. *Gricus,* 317 Mass. 403, 407 (1944). See also *Commonwealth* v. *Britt,* 358 Mass. 767, 770 (1971); *Commonwealth*

---

[2] The others of any importance were Miss Mack and a boy, Charles Payne, who was playing with others behind 71 Prentiss Street, and who testified (among other things) to having failed to see anyone passing through the rear door after the shooting.

[3] Vest's testimony must also be weighed (see below).

v. *French,* 357 Mass. 356, 397-398 (1970), judgments vacated as to the death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972).

2. Error is claimed in the trial judge's denial of the defendant's motions for a directed verdict in so far as the indictment charged murder. We think the murder charges could stand. Killing with extreme cruelty or atrocity being excluded from the jury's consideration, the evidence in its variant aspects or possible interpretations properly invoked the two other species of murder in the first degree, and murder in the second degree as well. The evidence was open to the construction of felony murder (murder in the commission or attempted commission of robbery). Murder with premeditated malice aforethought could be made out by stress on the fact that there was an invitation to Myers to assist before the victim emerged, and on a probability that the defendant fired the shots although sensing from the victim's hesitation that the victim was not going to fire. See *Commonwealth* v. *Caine,* 366 Mass. 366, 374 (1974); *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 230-231 (1967); *Commonwealth* v. *Stirling,* 351 Mass. 68, 75 (1966). Indeed, some of the evidence lent itself to an hypothesis (comparable to one alluded to by the defense in its closing argument to the jury) that the victim was being deliberately ambushed for killing.[4] So also, enough was shown to justify submission to the jury of murder in the second degree, an intentional killing without justification, or, otherwise stated, a killing with unpremeditated malice aforethought. See *Commonwealth* v. *Talbert,* 357 Mass. 146, 148 (1970); *Commonwealth* v. *Boyajian,* 344 Mass. 44, 48-49 (1962). It may be noted here that even if the defendant was taken to have acted in response to the victim's brandished gun, murder in the second degree remained relevant as the defendant could be considered the aggressor without benefit of a justifica-

---

[4] Thus the statement to Myers about taking or getting the victim could have referred to a standing quarrel. See 365 Mass. at 538 & n.4.

tion of self-defense. See *People* v. *McAuliffe*, 154 Cal. App. 2d 332, 340 (1957), cert. denied, 361 U.S. 920 (1959); *State* v. *Broadhurst*, 184 Or. 178, 237 (1948), cert. denied, 337 U.S. 906 (1949); R. Perkins, Criminal Law 1006-1007 (2d ed. 1969).

3. The defendant criticizes the judge's instructions to the jury, but some of these points attempted to be argued on the present appeal were neither preserved by exceptions when the instructions were given, nor clearly marked by denials of requests to charge. Nevertheless we express the opinion that the charge, taken as a whole, covering definitions of the several offenses mentioned above and of manslaughter, with discussion of self-defense, reasonable doubt, attempt, and other staples, contained no material error and was fair.

Passing over arguments obviously of little merit or made pro forma, we note a claimed error based on the judge's use at one point of the word "presumption" in respect to the intentional use of a deadly weapon as probative of malice. There is argument that this offended against *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), by easing unduly the Commonwealth's burden of proof, but, considering the whole charge, we think the jury would view the use of the weapon as giving rise to an inference of malice to be weighed with inferences, negative or positive, on the same topic derived from other evidence; all this leaving the Commonwealth with the burden of establishing beyond a reasonable doubt the essential elements of a murder. See the discussion in *Evans* v. *State*, 28 Md. App. 640, 704-705, aff'd 278 Md. 197 (1975). Similarly, we think the judge's charge is fairly read as leaving with the Commonwealth the onus of negating the factors, e.g., "provocation," that might reduce the crime to manslaughter. See *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687 n.4 (1976); *Hallowell* v. *Keve*, 412 F. Supp. 681 (D. Del. 1976). The charge describing the unanimity required for a verdict, also complained of, appears adequate. See *Commonwealth* v. *Sullivan*, 354 Mass. 598, 616 (1968).

4. We treat here of particular rulings in the course of

trial. (a) It was material to the Commonwealth's case that there were or may have been contacts between the defendant and Myers within a month of the homicide. To this end the Commonwealth proposed to introduce the testimony of the defendant at the prior trial that he had returned to Boston from Florida on November 13, 1971, and between that date and December 7, 1971, had seen Myers two or three times. The trial judge was seriously concerned about having the question-and-answer testimony put in evidence because that would inevitably inform the jury that the defendant testified at the first trial, which might provoke unfavorable guesses as to why he was not taking the stand at the present trial. Accordingly, the parties agreed at the judge's urging to have the prosecution read a prepared statement as follows: "The defendant has indicated in the past that he returned to Boston from Florida on November, the 13th, 1971; that between November 13th and December 7th he had seen Kenneth Myers two or three times; that the last time he was in Kenneth Myers' company was two or three weeks before December 15." The defendant preferred the statement to a reading of his actual prior testimony, but he reserved an exception to the introduction of the material in any form.

Acknowledging that a defendant's testimony at a former trial is generally admissible against him if relevant to the current trial (see *Harrison* v. *United States*, 392 U.S. 219, 222 [1968]; *United States* v. *Hughes*, 411 F.2d 461, 466 [2d Cir. 1969]; 8 J. Wigmore, Evidence § 2276 [5] at 472-473 [McNaughton rev. 1961]), the defendant argues that this was a special case where the error found in the former trial, which occasioned the reversal of the conviction, should be held to taint the defendant's testimony and forbid its further use. *Harrison* v. *United States, supra,* is cited. That, however, was an extreme situation in which it could be readily predicated that the trial error resulting in the reversal — admission of the defendant's coerced confessions — had produced a situation virtually coercing the defendant into testifying in his own behalf with self-damaging results. In the present case the error leading to

reversal was of a quite different character and its connection with the defendant's election to take the stand was so remote that it could be discounted. See *Kauffman* v. *Secretary of the Air Force*, 415 F.2d 991, 998-999 (D.C. Cir. 1969), cert. denied, 396 U.S. 1013 (1970); *Mapys* v. *United States*, 409 F.2d 964, 966-968 (10th Cir. 1969), cert. denied, 399 U.S. 932 (1970); *People* v. *Jenkins*, 10 Ill. App. 3d 588, 592-593 (1973).[5]

(b) The defense argues that the trial judge erred in admitting testimony by Vest recounting the defendant's false statements at the Sugar Shack. Vest was on ordinary patrol, not pointed particularly at finding the defendant. He was aware of the outstanding murder warrant and had been furnished a picture of the defendant. Glancing at the picture after he spotted the defendant, Vest was sure this was the man. Thus, according to the defendant, as Vest approached the defendant and said he was a police officer, Vest had already made the defendant a target and in effect placed him under arrest: the situation had become "custodial," especially as there were other officers in the vicinity (also in plain clothes) of whom the defendant may have been conscious. Accordingly, the defendant says he was entitled to Miranda warnings in advance of interrogation.

It requires much stretching of the facts to characterize the relation between Vest and the defendant as custodial. But regardless of the exact characterization, we do not think the threshold questioning about name and address was of a kind contemplated or controlled by the Miranda doctrine. It did not approach any particulars of a crime. The trial judge reached the right conclusion on the matter after conducting a voir dire and making specific findings which need not be detailed here. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 4 (1976); *United States* v. *Jones*, 457 F.2d 697, 699 (5th Cir. 1972); *People* v. *Hernandez*,

---

[5] Nor is the position different if we consider other possible shortcomings of the first trial adverted to on the prior appeal.

263 Cal. App. 2d 242, 253-254 (1968); *People* v. *Rivera,*
26 N.Y.2d 304, 309 (1970).

(c) As the defendant was bringing his case to a close,
he sought to meet an inference of consciousness of guilt
that might be drawn from the defendant's false answers to
Vest (a point whose possible importance was stressed in
the judge's charge). The defendant proposed to introduce
as part of his case a Superior Court default warrant in
respect to another offense, intended to suggest that his
response to Vest may have been actuated by consciousness
of his liability to arrest under that warrant, apart from
involvement in the homicide. Cf. *Commonwealth* v. *Fancy,*
349 Mass. 196, 201 (1965). Before refusing the offer, the
trial judge conducted a voir dire, with the advantage of
enabling the judge, and this court on review, to discern
with fair accuracy what effect admission of the paper
would have produced.

The warrant would show a conviction of the defendant
in the Municipal Court of the City of Boston of larceny
of less than $100, with default for failure to appear on the
defendant's appeal to the Superior Court. Conviction was
on September 2, 1969; the warrant issued on January 27,
1971 (nearly a year before the homicide).[6] The offer was
only of the warrant itself; the defendant was not proposing
to take the stand to explain his motivation or to introduce
any other connecting evidence. In response to the warrant,
the Commonwealth — if it considered the point weighty
enough — would likely have introduced the testimony of
the defendant at the first trial that he reacted as he did to
Vest's questions because he had been beaten up the last
time someone had asked his name, and because he had a
"bad habit" of lying to cops (see 365 Mass. at 539); no

---

[6] The warrant was cross-referenced on its cover to defaults on three
other offenses designated by number. These were in fact armed robbery,
larceny from the person, and receiving stolen goods. Counsel indicated
that he would offer before the jury only the larceny under $100 default
and would object to reference to the others as prejudicial.

mention here of a Superior Court warrant.[7] Introduction of the prior testimony would highlight the fact that the defendant was shrinking from the witness stand at the current trial, after having testified at the prior trial. The judge had been earlier at pains to try to insulate the jury from this knowledge. In all the circumstances, we think the judge could decline in discretion to admit the warrant unless it was better linked to the defendant's actions at the Sugar Shack (cf. *Commonwealth* v. *Caine*, 366 Mass. 366, 370 [1974]; *Commonwealth* v. *Geagan*, 339 Mass. 487, 510-511 [1959]); and if this should be accounted an error, we think it clear beyond a reasonable doubt that it could not have affected the defendant adversely. See *Commonwealth* v. *Morgan*, 369 Mass. 332, 340-341 (1975). Cf. *Commonwealth* v. *Roukous*, 2 Mass. App. Ct. 378, 384-385 (1974).

5. There is complaint of "prosecutorial misconduct" which in the defendant's estimation should have resulted in a mistrial and would now entitle him to a reversal of the conviction. We think the criticism is overdrawn. It would be a more just criticism of the trial to say that, despite repeated efforts by the judge, the zeal of defense as well as prosecution became on occasion excessive, and that the search for objective truth was sometimes hindered by the intrusion of personalities or other irrelevancies.

The defendant harks back to what was described in the prior opinion as "slackness" in the delivery of material to the defense before trial (365 Mass. at 550). Our impression is now, as it was then, that this was not deliberate withholding but the result of crowded preparation. And such problems as the defense faced in the first trial on that account were, we think, resolved by and large by the date of the second.

---

[7] The defendant had also testified at the first trial that his predicament in respect to the defaults had not been the reason for his going to Florida.

At the voir dire the defendant said he had not told the whole story at the first trial, that his reaction at the Sugar Shack was due in part to his consciousness of the defaults; but, as noted, the defendant was not proposing to take the stand and testify before the jury.

In the course of trial, the Commonwealth called one James Boddie, mentioned by the defendant in his testimony at the first trial as a person to whom he spoke while at Charles Street jail (365 Mass. at 539). The defense charges that the prosecution should have known, having been warned, that Boddie was a worthless witness, and that it so questioned Boddie that his very disclaimers of knowledge could be understood as insinuations against the defendant. We do not think it is shown that the prosecution was bound, on the basis of what it knew or should have known about Boddie, to refrain from attempting to use him as a witness. See *Commonwealth* v. *White,* 367 Mass. 280, 281-285 (1975); *Commonwealth* v. *LaFrance,* 361 Mass. 53, 56-57 (1972). The questions put to him as he appeared uncooperative or hostile were not egregious and the judge controlled possible excesses. Cf. *Commonwealth* v. *Monahan,* 349 Mass. 139, 162-163 (1965); *Commonwealth* v. *Coshnear,* 289 Mass. 516, 527 (1935).

In his summation, the prosecutor referred repeatedly to the fact that the victim was white and the defendant black and the scene a "project" with a heavy black population. There was no intention, we think, to try to inflame the jurors with racial prejudice. Contrast *Commonwealth* v. *Graziano,* 368 Mass. 325, 331-332 (1975). Rather the prosecution was entering into speculations about the probable motivations and behavior of such actors in such a situation when confronted with the homicide or official attempts to secure evidence. This amateur psychologizing was matched by defense reflections on how a young black man, for example the defendant, might respond although innocent to a police demand for his name and address. Counsel on both sides would have done better to stick more closely to the facts and to cut down on these ruminations, but we must attribute a certain sophistication to the jury as aided by the cautionary remarks of the judge.

It would not be fruitful to discuss all the details of the attack on the prosecutor's final speech or on his conduct as a whole. The attack fails, as we think the defendant was fairly tried. Members of the bar, however, would be most

ill-advised to consider that each departure from the norm which is not so grievous as to precipitate a reversal of a conviction sets a new and less elevated standard for lawyers' behavior. The concern of the court in this regard has been expressed repeatedly. See *Commonwealth* v. *Redmond,* 370 Mass. 591, 597 (1976); *Commonwealth* v. *Gilday,* 367 Mass. 474, 497 (1975); *Commonwealth* v. *Coleman,* 366 Mass. 705, 714 (1975).

6. There is no merit in the defendant's contentions (a) that the group from which the trial jury were picked should have been discharged by reason of underrepresentation of persons under twenty-four years of age (see *Commonwealth* v. *Cook,* 364 Mass. 767, 770 [1974]; *Commonwealth* v. *Lussier,* 364 Mass. 414, 423 [1973]); (b) that the judge erred in failing to ask additional specific questions aimed at uncovering racial prejudice on the part of prospective jurors (see *Commonwealth* v. *Lumley,* 367 Mass. 213, 221-224 [1975]; *Commonwealth* v. *Pinckney,* 365 Mass. 70, 73-74 [1974]; *Commonwealth* v. *Bumpus,* 362 Mass. 672 [1972], judgment vacated and remanded on other grounds, 411 U.S. 945 [1973], aff'd on rehearing, 365 Mass. 66 [1974]); (c) that the Commonwealth was shown to have abused its right of peremptory challenge of jurors. See *Commonwealth* v. *Mitchell,* 367 Mass. 419, 420 (1975); *Commonwealth* v. *King,* 366 Mass. 6, 7-9 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts,* 419 U.S. 1115 (1975); *Commonwealth* v. *Cook, supra.*

7. We have examined the entire record and find no basis for modifying the judgment or granting other relief under G. L. c. 278, § 33E.

*Judgment affirmed.*