## COMMONWEALTH vs. LAWYER JOHNSON.

Suffolk.  November 17, 1981. — January 6, 1982.

Present: ARMSTRONG, CUTTER, & KASS, JJ.

*Practice, Criminal,* New trial.

A judge did not exceed the limits of sound discretion in ordering a new trial
of a defendant on the basis of the newly discovered exculpatory testi-
mony of a woman who, as a child ten years of age, claimed to have
witnessed the 1971 murder of which the defendant had been convicted
at two previous trials.  [14-19]


MOTION for a new trial filed in the Superior Court De-
partment on February 19, 1981.

The proceeding was heard by *Griffin*, J.

*Michael Avery* for the defendant.

*Thomas J. Mundy, Jr.*, Assistant District Attorney
(*Michael J. Traft*, Assistant District Attorney, with him) for
the Commonwealth.

CUTTER, J.  The Commonwealth appeals from the order
of a Superior Court judge, granting a new trial to Johnson,
who was convicted (after a second trial) of the second
degree murder of a white man[1] on the steps of a housing
project unit at 71 Prentiss Street, Roxbury.  See as to post-
verdict appeals by the Commonwealth, *Commonwealth* v.
*Therrien*, 383 Mass. 529, 533-539 (1981), and *Common-
wealth* v. *Gaulden*, 383 Mass. 543, 550 (1981); Mass.
R.Crim.P. 25(b)(2), 378 Mass. 896 (1979).  The homicide
took place in the late afternoon of December 7, 1971. The
convictions of Johnson were obtained largely on the testi-

---

[1] Johnson's brief (at 30) describes the area as "a nearly all black neigh-
borhood."  Certainly all the alleged participants in the homicide were
black as were most of the witnesses from the neighborhood, so the victim
was probably conspicuous.

mony of Kenneth Myers, who admitted his presence at the scene, and conceded that he had been asked by one of two other black men to assist them in robbing the white man. The conflicting, shifting stories told by Myers are described in detail in two opinions of the Supreme Judicial Court.

In 1974, the Supreme Judicial Court reversed the death sentence for first degree murder imposed upon Johnson because the trial judge did not permit adequate defense cross-examination of Myers about other persons present at the murder scene. *Commonwealth* v. *Johnson*, 365 Mass. 534 (1974). The court (at 542) pointed out that "[w]ith Myers changing his story in material respects at least three times, pursuit of the identity of the two persons allegedly on the scene . . . about the moment of the crime — one of them supposedly a guilty participant —" was within the proper scope of exploratory cross-examination.

The first opinion of the Supreme Judicial Court refers, 365 Mass. at 549, to a witness, one Garry Pritchett, discovered after the first conviction of Johnson. This witness, as a basis for a motion for a new trial, presented before the first trial judge affidavits and testimony that, after the murder, he saw three men running from 71 Prentiss Street. He recognized one as Myers, whom he knew well. He could discern that neither of the others was Johnson, whom he also knew well. Because the case was to be reversed on other grounds, the Supreme Judicial Court did not discuss the motion for a new trial at length.

A second trial took place before a different Superior Court judge. Myers again was a principal witness against Johnson. Garry Pritchett also testified. Johnson's appeal from his conviction of second degree murder appears in *Commonwealth* v. *Johnson*, 372 Mass. 185, 189-190 (1977). There it is said of the prosecution witnesses: "Their trustworthiness was certainly questionable. Myers, with a criminal record, and *himself not clear of suspicion of the homicide,* was *a difficult and reluctant witness.* He gave a statement on December 7 intended to set the police on a

false trail . . . . His statement of December 8 and similar testimony, however, drew confirmation from the fact that he actually led the police to the gun, proved later to be the victim's [which Myers testified he had placed] on the roof of 61 Prentiss Street. At trial some of Myers's direct testimony was not congruent with his prior testimony, but the deviations could be taken as inessential and as occasioned both by the fleeting character of the happenings described and by some loss of memory over time. On cross-examination Myers was nominally acquiescent in some of defense counsel's suggestions at variance with his direct testimony, but the jury could surmise that he was not loath to leave the semblance, at least, of an escape hatch for . . . [Johnson] . . . . Myers and Franklin [another prosecution witness] were under pressure of their forthcoming trials on criminal charges at which they could hope that any past cooperation might earn them favor from the prosecutor. In each instance, then, there was a melange of motives. But assessment of the reliability of such witnesses is . . . traditionally within the range of exclusive competence of the jury" (emphasis supplied).

The second trial judge found Myers's testimony on at least one occasion "evasive." Myers himself quite freely admitted that he had lied on various earlier occasions. Initially at least, he had named as one of his companions on the day of the murder a person (one Simpkins), promptly shown to have been then in prison. Myers, then an admitted heroin addict, also conceded that he identified Johnson as being present at the murder scene only after the police had indicated that they could "get" Myers himself for the murder. There was ample basis for the comment, emphasized in the quotation in the preceding paragraph of this opinion, that Myers "himself [was] not clear of suspicion of the homicide."

Pritchett's testimony, favorable to Johnson, already has been summarized. About it, there was comment in the second opinion of the Supreme Judicial Court (372 Mass. at 190) as follows: "Similarly it was for the jury to assess the credit to be given the testimony of Garry Pritchett, the most

material of the witnesses offered by the defense." The opinion proceeded, "It might be accepted that Pritchett was near the scene when the shots were fired . . . . If it were accepted that he was trying to tell the truth, there would still be considerable doubt whether from his position he could have made the observations he testified to, including the negative observation about . . . [Johnson], with any substantial claim to accuracy. His testimony as a whole was clouded by suspicion that he was shaping his testimony to help save a friend, for it was not easy to accept his assertion that through the first trial, a half year after the homicide, he had not known that anyone had been charged with the crime." The court concluded that the Massachusetts decisions provide "no adequate basis for setting aside the jury's verdict." *Ibid*.

At the first trial, Johnson himself gave essentially the following testimony. He denied that he was present at 71 Prentiss Street at any time on December 7, 1971, but did not recall what he was doing that day. He had heard about the shooting a few days after December 7 from his sister. He had never owned a .38 caliber pistol. He had given a false name when arrested in a night club with his "girl friend" and his sister "[b]ecause the last fellow . . . [who] asked . . . [his, Johnson's] name . . . [he, Johnson] got beat up." He stated that "it is just a bad habit I got." The transcript of the first trial strongly suggests that Johnson was not an impressive witness. Nevertheless, his testimony created a direct conflict with that of Myers. At the second trial, Johnson did not testify except at one voir dire. See the comments concerning this in the second *Johnson* opinion, 372 Mass. at 195-196.

The foregoing history of the case is significant background for the present motion for a new trial, filed February 19, 1981. The motion was not heard by the second trial judge because she then was no longer on the Superior Court. It was assigned to a third judge of that court (the motion judge). New counsel was assigned to Johnson. Three witnesses testified at the two-day hearing on the motion. Exhibits were

introduced, including the transcripts of each of the earlier trials.

The motion was based on newly discovered evidence, viz. the testimony of a then nineteen-year-old woman, Dawnielle Montiero (hereafter Dawnielle), who had not been a witness at either earlier trial, that she, when ten years old, had been an eyewitness to the killing on December 7, 1971. She testified that Johnson, whom she knew, was not present at the scene and that Myers, whom she also knew, himself had fired three shots at the victim.

Dawnielle testified that she lived within the Mission Hill Housing Project, where violent incidents often took place. While returning with a younger friend from an errand to a store, she heard an argument in front of 71 Prentiss Street. She saw Kenny Myers come out of the door. Myers, from the bottom of the stairs (leading to the door) about "four or three feet in front of" her, fired at a white man standing on the landing. The victim, wounded in the head, fell forward on the stairs. Myers ran up the stairs into the building. Dawnielle ran around a fence between the buildings and straight home. There, after a period of crying, she told her mother, essentially that she "had seen Kenny Myers shoot someone in the head." After talking with her mother, she called the police department and told a woman who answered that she had "seen a killing, and . . . [the woman] asked . . . how old . . . [she] was, and . . . [Dawnielle] said . . . [she] was ten, and . . . [the woman] told . . . [Dawnielle] that . . . [she] couldn't help them anyway." Dawnielle did not state to the woman the place of the shooting or mention the identity of any participants. She made no later effort to talk to the police or to get in touch with people connected with the case because she was scared of Myers, who had a bad reputation in the project.

In the summer of 1980, she told her mother that she would be willing to testify. Her mother got in touch with Johnson's mother. Dawnielle had no relationship with Johnson and had not visited him in prison, or had any contact with him or his lawyers, before she told her mother that she wanted

to testify in the case. The foregoing was the substance of her direct testimony before the motion judge.

Dawnielle underwent a discerning and careful cross-examination by the assistant district attorney who had prosecuted Johnson at both earlier trials. He brought out that in 1971 Dawnielle had known Johnson as living in the project about a quarter mile from her; that she knew Garry Pritchett sufficiently to recognize him, but did not remember seeing him on December 7, 1971; that she knew Myers as a "close friend of . . . [her] grandfather's" and on that account, until she saw his gun, was not afraid of him, despite his bad reputation. She admitted that she had been told by her mother that Johnson had been arrested and charged with murder.

Dawnielle further testified that, after her mother had talked with Mrs. Johnson, Johnson (confined in Concord) himself called her and asked her to speak to his attorney and to visit him at Concord. She went there on two occasions, on the second occasion (because they both were "into art") to see some paintings he had done. She also saw him by arrangement when he was on furlough to attend an art show[2] at the Federal Reserve Bank. There, some of his paintings were on display. She has talked with him by telephone "every day since then." She denied that Johnson was "more than just a social acquaintance." On redirect examination she remarked that Johnson was some ten years her senior and pointed out his "girlfriend" in the courtroom.

Dawnielle's testimony about her actions after the murder was confirmed in general by her mother, who is engaged "in parent counselling" for an "anti-poverty program" (ABCD). The mother admitted that she had known Johnson since his birth and knows Johnson's mother and sister. She stated that she had discussed the subject of possible testimony with Dawnielle periodically over the years since 1971 and had refrained from talking to others about her "timid" daughter's disclosures to her because of Dawnielle's "emotional state"

---

[2] Containing pictures by professional artists as well as by prison inmates.

and because she "did not know what would happen to her on the streets."

The lawyer who had represented Johnson at his two trials also gave testimony before the motion judge. He described the thoroughness of his investigation of the case in 1971 and thereafter.

The motion judge made the following findings. (a) Dawnielle's testimony, if believed, would be pertinent to the question of who shot the victim especially since Myers, the main witness for the Commonwealth at the two prior trials, "was the only person who testified that he saw the shooting" and who placed Johnson "at the scene." Dawnielle's testimony "is at least credible enough to warrant presenting it to a jury" and would be "consistent with that of all other witnesses who testified at the previous trials, except . . . Myers" and also "with the physical evidence of the scene." Indeed, "it appears . . . more consistent with the physical evidence than" Myers's version. (b) The evidence is not cumulative and "presents an entirely different version of" the events of December 7, 1971. (c) The evidence was not available at either trial. Dawnielle's existence was not known to Johnson or his attorney, the Commonwealth, or anyone at the murder scene. (d) Failure to discover Dawnielle was not attributable to lack of diligence on the part of Johnson's prior counsel. (e) Dawnielle's testimony is "grave, material, and relevant enough to offer the probability that it would be a real factor with the jury." On these subsidiary findings, the motion judge concluded that a "new trial should be granted to avoid a substantial risk of a miscarriage of justice."

The Commonwealth's appeal from the order granting a new trial is based largely on contentions that there was no warrant in the evidence for the motion judge's subsidiary findings, especially those mentioned in subparagraph (a) of the preceding paragraph. The assistant district attorney points to various alleged conflicts between Dawnielle's account and those of witnesses at the trials.

(1) Pritchett did not mention seeing Dawnielle or her younger friend but did see three black males run to the street. He also did see young people in a small play yard and a fenced basketball court in the project. He did not recall seeing any people on the street or on the sidewalk immediately after he heard the shots, although he "might have" seen them without recalling them. The events of this murder happened rapidly. Pritchett may not have arrived at the scene as fast as he thought he did. His opportunity to observe was subject to the comment (quoted above) in the opinion on Johnson's second appeal. See 372 Mass. at 190. Dawnielle said she and her friend left the scene as fast as they could after the shots were fired and did not look back. Myers and his two companions may have emerged from 71 Prentiss Street and followed them rapidly.

(2) Dawnielle did not observe any young hockey players behind the building and said the project lights were not burning. Charles Payne, who was playing hockey, ran through 71 Prentiss Street by a rear door and saw no one, and said the project lights had been turned on. The time needed for Payne to react after hearing the shots and to go through the building was uncertain, and whether the lights were on or off may turn out to be of no great importance.

(3) It is suggested that Dawnielle's account of Myers's position when the shooting occurred is inconsistent with the medical examiner's testimony that the gun was fired approximately two feet or less from the victim. One photograph in evidence shows that the landing outside of 71 Prentiss Street is reached by only three steps (apart from the landing itself). The distance between the ground level at the bottom of the steps and the landing appears to be about six to nine feet. After ten years, precise accuracy as to the positions of the participants and as to the time in the afternoon when the events occurred, perhaps could not be expected of a girl ten years old at the time of the murder.

(4) Dawnielle testified to hearing three shots, whereas Pritchett at the time of the second trial believed there had been only two shots, although at an earlier hearing he had

thought that there had been three shots.  Myers himself was confused on this at the first trial.

(5) Dawnielle described the victim as wearing a suit and tie and carrying a briefcase and as someone who she thought was "an insurance man."  In fact, the victim wore a leather jacket and dungarees and carried no briefcase.  There was testimony, however, that he carried a brown lunch bag which conceivably could have been mistaken for a brief-case.[3]

The objections in behalf of the Commonwealth largely concern matters as to which different views of the evidence at trial and before the motion judge reasonably may be entertained.  These objections do not permit us to reject the conclusion of the motion judge that Dawnielle's account "is of potentially great independent significance" and should be submitted for the consideration of a jury.  The motion judge saw and heard Dawnielle and her mother testify and was in a far better position to appraise their credibility than we are now, although she was not the trial judge at either of the earlier trials.  See and compare *Commonwealth* v. *Ellison*, 376 Mass. 1, 17 (1978); *Commonwealth* v. *Richardson*, 1 Mass. App. Ct. 348, 349 (1973).  The new evidence before her was oral and not merely documentary.  She reasonably did not attempt to determine the facts herself but only concluded that the testimony called for a jury reappraisal.

The circumstances of this motion for a new trial are obviously unusual.  There had been nearly a decade between the murder and Dawnielle's decision to testify.  There exist reasons, already mentioned, to doubt the accuracy of Dawnielle's testimony in detail, and to question why she

---

[3] The Commonwealth's brief before us suggests that Dawnielle's description may have been inspired by the Commonwealth's argument at the second trial urging the jury to put themselves in the victim's position if he had been an insurance adjuster on his way to see a resident of the project about a claim.  It is not shown that Dawnielle knew of this argument made in 1974.  There was testimony at Johnson's second trial (a) that the victim owned a hand gun and that it was missing after he left his apartment, and (b) that he was a heroin addict.

had failed to come forward with it earlier. Johnson's testimony at the first trial had not seemed particularly convincing, but he had not testified before the jury at the second trial, a matter which the motion judge could take into consideration. See *Mayer* v. *United States*, 259 F.2d 216, 217 (6th Cir. 1919); 5 Orfield, Criminal Procedure under the Federal Rules § 33:81, at 364 (1967 and 1981 supp.). The motion judge necessarily considered all these and other factors. See *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651 (1980). She referred expressly to the existence of a strong "policy against granting a new trial based on newly discovered evidence." See *Davis* v. *Boston Elev. Ry.*, 235 Mass. 482, 495-496 (1920); *Evans* v. *Multicon Constr. Co.*, 6 Mass. App. Ct. 291, 295 (1978).

The discretion, with respect to granting or denying a new trial, of a motion judge is very broad. See *Commonwealth* v. *Markham*, 10 Mass. App. Ct. at 653-655. If the motion judge applies the appropriate standards, the instances in which that judge will be reversed are extremely rare. Obviously, a reversal involves essentially concluding that there has been an abuse of discretion, although the decision upon that issue is subject to appellate review. *Commonwealth* v. *Woods*, 382 Mass. 1, 8-10 (1980). See *Blaikie* v. *District Atty. for the Suffolk Dist.*, 375 Mass. 613, 618-619 (1978). In the present case, we cannot say that the motion judge acted beyond the limits of a sound discretion in deciding that, to avoid risks of a miscarriage of justice, the possibility that Myers's testimony was not reliable should be weighed by a jury against any uncertainties inherent in Dawnielle's new evidence. See Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979). Certainly we cannot say that a jury, hearing the new evidence, might not reach a different result.

*Order granting a new trial*
*affirmed.*