Morris MORGAN, Petitioner, Appellant,

v.

Frank A. HALL, etc., et al.,
Respondents, Appellees.

No. 77–1414.

United States Court of Appeals,
First Circuit.

Argued Dec. 5, 1977.

Decided Jan. 26, 1978.

Robert S. Potters, Boston, Mass., for petitioner, appellant.

Robert V. Greco, Asst. Atty. Gen., Criminal Div., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief Criminal Bureau, Boston, Mass., were on brief, for respondents, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal is from the district court's denial of Morgan's habeas corpus petition. When petitioner took the stand at his state criminal trial, the prosecutor asked questions which focused upon his silence after arrest. As these were constitutionally improper, *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), we must decide if the prosecutor's error was harmless beyond a reasonable doubt.

Morris Morgan, a 32 year old black, was accused of abducting and raping Barbara Palkey, a 26 year old white, in the early morning hours of March 24, 1974. Indicted in Massachusetts for assault and battery, commission of a lewd and lascivious act, rape, sodomy and kidnapping, he was tried before a Superior Court jury in September, 1974. The jury found him not guilty of kidnapping and sodomy but guilty on the other counts and he was sentenced to 12 to 15 years in state prison. Upon appeal, the Massachusetts Supreme Judicial Court took direct jurisdiction on its own motion and affirmed the conviction in December, 1975. *Commonwealth v. Morgan*, Mass.Adv.Sh. (1975) 3635, 339 N.E.2d 723, *cert. denied*, 427 U.S. 905, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976). Morgan filed this petition in the district court in August, 1976. The district court declined to issue the writ but issued a

certificate of probable cause to permit an appeal.

According to the testimony of the alleged victim, Miss Palkey, she went with a friend on the evening of March 23, 1974 to a large nightclub in the Fenway Park area of Boston. She arrived at the club about 10 p. m. and after an hour decided to leave. She discovered she had lost the check for her coat, and the club refused to return it until all other coats had been picked up. She resigned herself to staying until the 2 a. m. closing time, but her girlfriend ran into a male friend and departed around midnight. During her stay at the club, Palkey drank one coke; she sat at a table with her friend until she left and then stood against the wall, not talking to anyone except to decline offers to dance. At 2 she retrieved her coat and began walking the several blocks to where her car was parked. Outside the club many young people, perhaps as many as a hundred, were milling around. At that point Morgan came up to her and asked if he could walk with her. She indicated it wouldn't be necessary, but he stayed with her. They turned from the still populated main street to a side street where she had parked. Her car was hemmed in by other cars, and they were alone on the street. Morgan asked for a ride home; intimidated by the situation, she agreed. Apparently she was able to get into her car and lock all the doors, but then unlocked the passenger side to let him in.

She drove through Kenmore Square and down Commonwealth Avenue. Until they reached Exeter Street, Morgan behaved in a mild and friendly manner, but when they turned onto Exeter, he grabbed her by the neck, dug his nails in, and told her to pull over or he would kill her. She offered him her purse, but he said he was going to rape her. They drove around looking for a parking space, passed a disabled motorist in the middle of the street, and eventually settled on a space by a fire plug. He released her neck but kept hold of her arm as they walked to his apartment; he told her he was just out of Walpole and wouldn't hesitate to kill her if she tried to seek help. They passed many people on the street, mostly students leaving parties in the neighborhood.

Palkey went into Morgan's apartment, undressed at his command and submitted to a variety of sexual acts. According to her testimony, in the course of the next three hours Morgan raped her three times, sodomized her twice, forced her to perform oral sex on him twice, and performed oral sex on her once. According to Palkey, Morgan again asserted he recently had been released from Walpole as the result of a legal technicality. By the end of the evening, she was sitting on the edge of the bed crying. Morgan asked her if she was ready for a beating, tapped her lightly on the chin, and then struck her on the jaw. When she arose, her mouth was bleeding and her teeth were awry; her jaw had been broken. Morgan looked stunned and got her a towel to stem the bleeding. He said he would have to take her to a hospital and asked her what she would say; she suggested she would fabricate a story about falling down the stairs. They walked to her car, and she got in. Morgan, standing in the street by her side of the car, said something she could not make out. She answered softly, and when he leaned over to hear her, she pulled out a can of mace from her purse and sprayed him full in the face. She then drove away, stopping at Kenmore Square to call a neighbor who lived across the street from her parents, where she resided at the time. He told her to go to St. Elizabeth's hospital, where he met her after informing her parents of her plight.

Medical examination revealed a fracture of the jaw in three places and the presence of semen in Palkey's vagina. The gynecologist who examined her could not find any evidence of anal intercourse, and neither she nor the oral surgeon who examined Palkey found any evidence of trauma on Palkey's neck. The oral surgeon testified that the jaw injury was consistent with a blow from a blunt object, such as a fist, but was inconsistent with a fall onto a flat surface, such as a floor, or a blow from a sharp object, such as the edge of a table. The surgeon had treated many injuries

caused by fists during his military service. The gynecologist took a sexual history, which indicated that Palkey had been sexually active for eight years, had used an I.U.D. coil for 10 months, and had had sexual intercourse four days previous to her contact with Morgan. Her account of the assault at that time conformed to her later testimony at trial.

A Boston police officer, Detective Rufo, testified that on Monday, the twenty-fifth, he interviewed a young woman in Morgan's apartment. The young woman, who identified herself as a friend of the defendant's, told the detective she had spent Friday and Sunday nights in Morgan's apartment but had not seen him between Saturday afternoon and Sunday evening. Rufo then took 15 pictures to the hospital, from which Palkey identified Morgan's. Rufo went to Morgan's place of employment, gave him *Miranda* warnings, and arrested him. During cross-examination of Rufo by Morgan's attorney, the following exchange occurred:

XQ. You advised him of his rights?

A. Yes.

XQ. One of his rights was that he had a right to be silent?

A. Yes.

XQ. And he exercised that right?

A. Yes.

XQ. Nothing wrong with that, is there?

Mr. O'Neil: I object.

A. No.

The Court: I'll let it stand.

The detective did not observe any facial injury on Morgan that might have been caused by mace.

Morgan took the stand in his own defense and told a dramatically different story. He claimed to have met Palkey in the nightclub, danced with her once, and then received a proposition of sex for money. He left the offer pass at that time; later in the evening, she encountered him again and they began negotiating a price. After agreeing that she would receive $15, they left together and she drove him to his apartment. They had sexual relations, and Morgan then fell asleep. He denied having

sodomized her. He woke up to see Palkey slipping out his door with his television set. He sprang up, grabbed her by the arm and flung her back into his apartment. She tripped over some furniture and her head struck his coffee table. He went over to his bureau, discovered that all his money had been stolen, and demanded its return. He noticed Palkey was injured and helped her try to stop the bleeding. She decided to go to the hospital on her own, and Morgan offered to pay her expenses.

On cross-examination the prosecution attempted to impeach Morgan's credibility. After running through Morgan's version of Palkey's conduct, the prosecution initiated this line of questioning:

XQ. Did you when this was over, did you report this to the police?

A. No.

XQ. Did you make any attempt to communicate this information to the police?

A. No.

XQ. Did you tell Detective Rufo when he came for you?

A. No.

XQ. Did you mention anything about that to him?

A. No.

Mr. Banks: I object.

The Court: Sustained.

XQ. Did you mention to anyone, to any one of the police that you happened to see—

Mr. Banks: I object. May I approach the bench.

The Court: Yes.

*At the Bench:*

Mr. Banks: Your Honor, May it please the Court, I am going to move for a mistrial—he has three times entered that area after objection.

The Court: What do you say?

Mr. O'Neil: Your Honor, I merely asked that since he is claiming the woman was a prostitute and committing a crime, did he report that to the police.

The Court: I will sustain the objection.

Mr. Banks: Exception.

The Court: I would keep away from that, because it's a very fine line. He was under no obligation to say anything.

Mr. O'Neil: I know that.

*In Open Court:*

The Court: I should tell the jury that when the defendant was arrested, one of the rights that he has is the right to remain silent.

He is under no obligation to speak to the police.

And, therefore, the question: Did you tell the police this or that—that is really not proper. And I will ask you to exclude it from your mind.

He was under no duty to tell the police anything.

The state also brought out, by way of impeachment, that Morgan had been convicted of heroin possession in 1972. In his instructions, the Superior Court judge informed the jury that Morgan had received a suspended sentence and two years probation for this conviction. Morgan denied ever having been incarcerated in Walpole, and no evidence of such imprisonment was introduced or, apparently, extant.

The right Morgan claims here was not recognized by the Supreme Court as constitutionally required until after Morgan had exhausted state proceedings, but both the trial court and the Supreme Judicial Court assumed that prosecutorial efforts to impeach a defendant through his post-arrest silence were improper, if not unconstitutional. Their assumption was confirmed first by *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and ultimately by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Hale*, which came down before the Supreme Judicial Court's decision in this case, and rested on the Supreme Court's supervisory power over federal courts, held that evidence concerning post-arrest silence was inadmissible because of its lack of probative value and inherently prejudicial effect. The Court remarked on the inherent ambiguity of such silence:

"Respondent, for example, had just been given the *Miranda* warnings and was particularly aware of his right to remain silent and the fact that anything he said could be used against him. Under these circumstances, his failure to offer an explanation during the custodial interrogation can as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication. There is simply nothing to indicate which interpretation is more probably correct."

*Id.* at 177, 95 S.Ct. at 2137. Furthermore, the fact of silence bore a significant potential for prejudice:

"The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest."

*Id.* at 180, 95 S.Ct. 2138. These factors, and the lurking constitutional implications, led the Court to pronounce a per se rule on the admissibility of such evidence.

The next Term, the Court in *Doyle* broadened *Hale* into a constitutional holding. As in *Hale*, the defendant at trial presented an exculpatory story that he had not mentioned at the time of arrest. During cross-examination the prosecution questioned him about his earlier silence; unlike *Hale*, the court overruled counsel's timely objections. The Supreme Court, relying on something akin to an implied contract theory, ruled that the interrogation violated due process:

"Silence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. *See United States v. Hale*, 422 U.S. at 177, 95 S.Ct. 2133. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is im-

plicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

426 U.S. at 618, 96 S.Ct. at 2244. The effect of this holding was to apply *Hale* with full force to state criminal trials.

Both *Hale* and *Doyle* suggested, however, that in some instances prosecutorial comment on post-arrest silence, although unconstitutional, might constitute a harmless error under the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Hale* the defense had objected promptly to the questioning and received a careful instruction from the court. The court of appeals nevertheless held the error was not harmless, and the Government did not press the point before the Supreme Court. 422 U.S. at 175 n.3, 95 S.Ct. 2133. In *Doyle* the state did not contend the error was harmless. 426 U.S. at 619–20, 96 S.Ct. 2240. But the Court's recognition of the issue implied the applicability of the principle.

Both the Massachusetts Supreme Judicial Court and the district court treated the prosecutor's conduct in this case as constitutionally improper, and we have no reason to doubt that they were right. Although the prosecutor's first two questions, directed merely at the defendant's failure voluntarily to report Palkey's behavior to the police, were not by themselves improper, the last three were all directed at the defendant's silence after apprehension and arrest. Previous testimony had established that Morgan had no contact with Detective Rufo until Rufo came to put him under arrest; there was no time during that encounter when Morgan could have protested his innocence before his arrest. Furthermore, however innocent-appearing the first two questions, they seem designed only to set the stage for interrogation about Morgan's

post-arrest silence. There was little reason, even under Morgan's story, to expect him to have reported Palkey to the police: he had thwarted her attempted robbery, and any complaint about her prostitution would have been self-incriminating. The prosecutor, indeed, conceded to the court he knew that Morgan was under no obligation to say anything, yet continued to pursue the matter after one objection by defense counsel was sustained. We can only assume that notwithstanding the obvious sensitivity of the subject, he was determined to score points with the jury at whatever cost.

■ We must therefore decide whether, as found by the Supreme Judicial Court, the prosecutor's unconstitutional conduct was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Those cases following *Chapman* indicate that a reviewing court must assess the record as a whole to determine the probable impact of the improper evidence on the jury. *See Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The prejudicial effect of the improper conduct must be weighed against the weight of the properly admitted evidence. *Schneble v. Florida, supra.*

Both the Supreme Judicial Court and the district court postulated that the evidence of guilt in this case was far from overwhelming, at least as far as the rape charge was concerned.[1] The two accounts of the evening directly contradicted each other, and particular portions of Palkey's story, especially her presence at the nightclub and apparent willingness to give Morgan a ride home, tended to buttress Morgan's defense of consent. Other portions of Palkey's testimony might seem questionable to a jury, such as her claim of seven different sexual acts by Morgan in the course of little more

---

1. The Supreme Judicial Court observed, "In the present case, there was a sharp conflict between the testimony of the victim and that of the defendant. Thus the record does not provide, as it has in some other cases, clear overwhelming evidence of guilt." Mass.Adv.Sh. (1975) at 3648, 339 N.E.2d at 729.

than three hours. The medical evidence, although supporting her account of how her jaw was broken, did not substantiate either the claim of sodomy or Palkey's version of how she was forced into Morgan's apartment. The jury's acquittal of Morgan on the kidnapping and sodomy charges suggests the jury had at least some doubts about Palkey's testimony.

Nonetheless, the Supreme Judicial Court was of the opinion that the error was harmless beyond a reasonable doubt "because of the trivial or inconsequential nature of the entire incident." Mass.Adv.Sh. (1975) at 3648, 339 N.E.2d at 729. The court also referred to the curative effect of the trial judge's instructions to the jury immediately after the incident. The district court was not as sure about the insignificance of the incident, but ruled that it was bound to regard the improper questioning as harmless here because prior precedent in this circuit indicated a prompt and forceful instruction by the trial judge could cure the error. We turn first to the question of the effect of the instruction in ameliorating the harm caused by this episode.

Although the actions of the presiding judge were commendable as well as perceptive in light of the undeveloped state of the law at that time, we are unable to conclude that his efforts were sufficient to purge the prejudicial questioning. The cases in this circuit on which the Supreme Judicial Court and the district court relied all involved prosecutorial comment on the failure of the defendant to take the stand. *See e. g., United States v. Flannery,* 451 F.2d 880 (1st Cir. 1971). In such cases, this court has declared:

> "If the court interrupts the argument, instructs the jury fully on the defendant's constitutional right not to testify and the jury's obligation not to draw unfavorable inferences and, in addition, states to the jury that the U. S. Attorney was guilty

of misconduct, we may find no prejudice . . .."

*Id.* at 882. The situation where a defendant does not take the stand, however, is distinguishable from a failure to mention an exculpatory story upon arrest. As this court has recognized, the defendant's failure to testify in his own behalf ordinarily will be apparent to the jury, and comment directed to that fact to some extent only accentuates the obvious. *See Goitia v. United States,* 409 F.2d 524, 528 (1st Cir. 1969), *cert. denied,* 397 U.S. 906, 90 S.Ct. 896, 25 L.Ed.2d 86 (1970). Here, by contrast, the fact that a defendant did not tell his story when first confronted by the police is not so obvious. Even when the fact of silence upon arrest is brought out, further development is needed to tie this silence to the subsequently raised exculpatory story.

In the one cause since *Doyle* where this circuit has held improper comment on post-arrest silence to be harmless error, the state trial court instructed the jury much as was done here. *Booton v. Hanauer,* 541 F.2d 296, 299 (1st Cir. 1976). We emphasized, however, that the improper testimony was not calculated to damage a point upon which a defense was being constructed. *Id.* The opposite is true in this case.

Other circuits, in ruling on the harmlessness of *Doyle* violations, have expressed serious reservations about the efficacy of curative instructions. *See United States v. Johnson,* 558 F.2d 1225 (5th Cir. 1977); *Reid v. Riddle,* 550 F.2d 1003 (4th Cir. 1977); *United States v. Impson,* 531 F.2d 274 (5th Cir. 1976); *United States v. Anderson,* 162 U.S.App.D.C. 305, 402, 498 F.2d 1038, 1045 (1974) (quoting *Stewart v. United States,* 366 U.S. 1, 10, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961)), *aff'd sub nom. United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).[2] Those cases that have held such errors to be harmless have emphasized not

---

2. The state seems to imply in its brief that decisions applying and interpreting *Hale* are not relevant to this case, as *Hale* involved only federal prosecutions. Although it is true that *Doyle* and *Hale* rested on different sources of judicial power, the rule announced by the later

case was identical to that formulated in *Hale.* Thus those decisions grappling with the harmlessness of *Hale* violations apply at least by way of strong analogy to cases grounded on *Doyle.*

the presence or absence of curative instructions but the overwhelming evidence of guilt. *See Moore v. Cowan*, 560 F.2d 1298 (6th Cir. 1977); *Stone v. Estelle*, 556 F.2d 1242 (5th Cir. 1977); *United States v. Davis*, 546 F.2d 583 (5th Cir.), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977); *United States v. Wycoff*, 545 F.2d 679 (9th Cir. 1976), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977); *Meeks v. Havener*, 545 F.2d 9 (6th Cir. 1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2980, 53 L.Ed.2d 1096 (1977); *Jones v. Wyrick*, 542 F.2d 1013 (8th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 807 (1977). In several cases the error was held harmless because the defendant did not present an exculpatory story that his silence would impeach. *United States v. Sklaroff*, 552 F.2d 1156 (5th Cir. 1977); *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Booton v. Hanauer, supra*. In no case has a prompt and forceful instruction alone been held sufficient to vitiate the use of post-arrest silence.

Although the instruction alone did not rid the prosecutor's error of harmful impact, we must also consider whether, in light of all the circumstances, the incident was so insignificant as to be harmless beyond a reasonable doubt. The Supreme Judicial Court stressed "that the cross-examination did not deal directly with the subject of the defendant's guilt but with the collateral question, still important to be sure, of his credibility." Mass.Adv.Sh. at 3645, 339 N.E.2d at 728. In the circumstances of this case, however, the questions of guilt and credibility were inextricably bound together. Morgan's story, if it were to be believed, would have established the fact of consent and thereby disproved an essential element of the crime of rape.

■ In this appeal, the state does not press the distinction between credibility and guilt, but rather emphasizes that Morgan's attorney had brought out the fact that his client had remained silent when arrested through his cross-examination of Detective Rufo. It contends that this earlier exchange vitiated whatever prejudice resulted from the prosecutor's questioning. The question is a close one, but we find it hard to say the linkage between this silence and an attack on Morgan's credibility, the product of the prosecution's conduct, was harmless beyond a reasonable doubt. Defense counsel only exposed the fact of silence; the prosecution tried to use this silence to undermine Morgan's story, exactly the kind of behavior prohibited by *Hale* and *Doyle*. The district court thought "the evidence in [the earlier] context was not as prejudicial as its subsequent use to impeach the defendant's credibility."

In one case posing a similar problem, the Ninth Circuit held that the prosecution's reference to the withholding of certain documents by the defendant to undermine defense arguments was harmless error, where the defendant himself had volunteered the fact during cross-examination. *United States v. Helina*, 549 F.2d 713 (9th Cir. 1977). However, the court believed defendant had failed to object to the prosecutor's comments and expressed reservations about the applicability of the constitutional privilege to documents. A strong dissent argued that defendant had properly preserved his objection, that *Doyle* clearly applied, and that the error could not be deemed harmless. *Id.* at 721–22 (Ely, J., dissenting).

In this case the behavior of the prosecution fell exactly into that category of conduct that the Supreme Court prohibited in *Hale* and *Doyle*. Furthermore, the defense promptly moved for a mistrial and preserved its objection to the decision to go on with the trial. Consequently, it would be difficult to hold the misconduct harmless. The writ must therefore issue.

■ A final point involves the applicability to this case of the doctrine announced in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Although the issue was not raised by either party, the question is jurisdictional and therefore can be raised at any time and on the court's own motion. Although at least one federal court has held

a petition for habeas corpus grounded on a *Doyle* violation to be barred by *Stone, see Moore v. Cowan, supra,* 560 F.2d at 1301, we decline to do likewise. The Supreme Court held in *Hale* that the probative value of post-arrest silence, if any, is far outweighed by its prejudicial effect; if so, we can hardly see that this silence is the kind of reliable evidence bearing on the guilt or innocence of the petitioner, the excludability of which might be precluded from habeas review after *Stone. See* 428 U.S. at 490, 96 S.Ct. 3037.

The writ of habeas corpus shall issue unless within 90 days from the date of this opinion the Commonwealth has either instituted proceedings to retry the petitioner or applied for a writ of certiorari. If certiorari is sought and granted, the issuance of the writ of habeas corpus shall be stayed pending further order of the Supreme Court. If certiorari is sought and denied, the writ of habeas corpus shall issue unless the Commonwealth has instituted proceedings to retry the petitioner within 30 days after the date of certiorari is denied.

*So ordered.*