COMMONWEALTH vs. ABDUL J. MAHDI.

ABDUL J. MAHDI, petitioner.

Hampden. November 2, 1982. — April 8, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Insanity. Constitutional Law,* Assistance of counsel, *Practice, Criminal,* Assistance of counsel, Capital case, Fair trial, Comment by prosecutor, Argument by prosecutor. *Error,* Harmless.

Where neither side on an appeal from criminal convictions in a trial held prior to this court's decision in *Commonwealth* v. *Saferian,* 366 Mass. 89 (1974), argued the question of the retroactive effect of the standards for competence of counsel articulated in that case, this court did not reach the issue of retroactivity, but instead considered alleged inadequacies of defense counsel on the broader question whether the events at trial presented a substantial risk that a miscarriage of justice had occurred. [685-690]

On an appeal from convictions of murder and other serious crimes, in which the record did not disclose the racial composition of the jury pool or of the selected jury, and did not reveal whether peremptory challenges had been used to affect the racial composition of the jury, no issue as to competence of defense counsel was raised by counsel's failure to object to the trial of black defendants by an allegedly all-white jury. [690]

At the trial of indictments for murder and other serious crimes, in which potential for racial tension existed, inflammatory references by the district attorney, in his cross-examination of the defendant and in his closing argument, to the defendant's racial origins and religious beliefs created a substantial risk of a miscarriage of justice, inasmuch as no evidence was presented to indicate that the crimes were motivated by racial hatred or religious fanaticism. [691-693]

At a murder trial in which the sole defense was insanity, questions by the district attorney to a police officer concerning the defendant's exercise of his right to remain silent after his arrest, and the district attorney's subsequent use of the defendant's silence in closing argument in order to encourage an inference of sanity, were harmful error which, in the circumstances, presented a substantial risk of a miscarriage of justice. [694-698]

INDICTMENTS found and returned in the Superior Court on January 9, 1968.

The cases were tried before *Good,* J.

PETITION for a writ of habeas corpus filed in the Superior Court Department on May 11, 1979.

The case was heard by *Good,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Richard A. Johnston (Robert D. Keefe & Christopher Weld, Jr.,* with him) for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. On May 28, 1968, the defendant, Abdul J. Mahdi,[1] was found guilty by a jury of the crimes of murder in the first degree, assault with intent to murder by means of a dangerous weapon, and two counts of armed robbery.[2] He was sentenced to the Massachusetts Correctional Institution at Walpole for life imprisonment on the murder conviction, for eighteen to twenty years on the assault conviction, and eighteen to twenty years on the armed robbery conviction. The latter two sentences were to take effect concurrently, but from and after the sentence on the murder conviction.[3]

---

[1] The defendant's name at the time of trial was Irvin Jones. In keeping with his religious beliefs, he was using the name Irvin 2X Jones at the time of trial, and he has since changed his name to that under which this appeal has been brought.

[2] An additional conviction for unlawfully carrying a firearm on the person was placed on file and is not before us on this appeal.

[3] The lateness of this appeal is partly explained by the following procedural saga. No appeal was filed on Mahdi's behalf after the trial. On April 9, 1971, after learning that no notice of appeal had been filed, Mahdi filed a pro se motion with the trial court to obtain the trial transcript. No action was taken on this motion by the trial judge for many years. On May 11, 1979, Mahdi filed a petition for writ of habeas corpus in the Superior Court in Hampden County. Counsel was appointed to represent the defendant, and the motion for the trial transcript was allowed in 1979. The district attorney later reported to the judge in that case that all copies of the trial transcript had been lost. When no action was taken on the petition for habeas corpus after oral argument, Mahdi filed a like petition in the Supreme Judicial Court for Suffolk County in

Mahdi contends that his convictions should be reversed because (1) he was deprived of his constitutional right to effective assistance of counsel, and (2) affirmance would cause a miscarriage of justice resulting from improper and prejudicial questioning and closing comments by the district attorney.

We find the criticism by the defendant of his trial counsel's performance to be overdrawn, despite some slackness in defense counsel's preparation and advocacy. A more just description of the trial is that the interaction between a barely adequate defense attorney and an experienced but overzealous district attorney caused the intrusion of personalities and other irrelevancies which obscured the search for truth.[4] Cf. *Commonwealth* v. *Johnson,* 372 Mass. 185,

---

1980. A single justice transferred the petition to the Superior Court for appointment of counsel. Present counsel was then appointed. In October, 1980, the trial judge entered a judgment denying and dismissing the first habeas corpus petition. Mahdi appealed that judgment and successfully applied for direct appellate review by this court. While that appeal was pending, a single justice of this court, in connection with Mahdi's habeas corpus petition in the county court, referred the case in 1981 to the trial judge for a determination as to whether Mahdi had waived his right to appeal, or whether his trial counsel failed to apprise him of these rights or to assert them on Mahdi's behalf. In late 1981 the trial judge filed a preliminary report with the single justice indicating that both the Attorney General (representing the Commonwealth in the habeas corpus petition) and the district attorney had agreed to the reinstatement of Mahdi's right to appeal his 1968 convictions. In December, 1981, the single justice entered a judgment granting Mahdi leave to file a late notice of appeal from his 1968 convictions and ordered this appeal consolidated with the appeal from the dismissal of Mahdi's first habeas corpus petition. On January 18, 1982, Mahdi filed a notice of appeal of his three 1968 convictions. In February, 1982, the district attorney notified Mahdi's counsel that most of the trial transcript, previously believed lost, had been located. Because his right to appeal his three 1968 convictions has been reinstated, Mahdi no longer argues the issues raised in the consolidated appeal, and the issues in that appeal are deemed waived. The maneuvering for advantage between the parties in this process reflects similar attitudes at trial between the district attorney and trial defense counsel.

[4] On several occasions, the district attorney made disparaging remarks about trial counsel. On other occasions, he sarcastically questioned the defense expert witness and the defendant. This is not appropriate courtroom decorum. See *Commonwealth* v. *Johnson,* 372 Mass. 185, 197-198 (1977).

196 (1977). We conclude that the references by the district attorney to the exercise by the defendant of his right to remain silent after arrest, and to the racial origins and religious beliefs of the defendant, present a substantial risk of a miscarriage of justice and thus require reversal of the convictions.

The facts are summarized as follows.[5] Mahdi had been a Muslim since 1955. He was a member of the Muslim mosque in Springfield and spent many evenings and weekends engaged in religious activities, including travelling throughout New England and New York to disseminate religious publications. On the evening of December 29, 1967, he was asked to travel to New York city with Odris Hastings and Arthur Hurston, Jr.,[6] to pick up religious newspapers. After obtaining money from the mosque for gasoline, Mahdi purchased with these funds a gun and a blackjack which he carried around intermittently for the next three days.[7] After Mahdi picked up the other two men and drove with them to New York, they distributed newspapers at various cities in New England. They returned to Springfield the next evening. The following afternoon, December 31, Mahdi drove to Albany with Hastings, Hurston, and others for a religious meeting and returned to Springfield late the same night.

---

[5] Additional facts pertinent to specific issues are set forth elsewhere in this opinion.

[6] Hastings and Hurston were codefendants at this trial. They were indicted for murder in the first degree, armed robbery (two counts), assault with intent to murder by means of a dangerous weapon, four charges of being an accessory before the fact to each of the above offenses, four charges of being an accessory after the fact to each of the above offenses, and conspiracy. They were convicted of two counts of armed robbery, as accessory after the fact to murder, and as accessory after the fact to assault and battery with intent to murder by means of a dangerous weapon. No appeal relating to their convictions was taken. They did appeal, however, their sentences.

[7] Mahdi testified that he "accidentally" met someone who sold him the gun. He admitted, however, that he bought it with the intention to use it to rob someone. Before the shooting, during this particular weekend, Mahdi had gone to a Connecticut store intending to commit a robbery but had abandoned the attempt out of fear.

Plans were made to return to Albany the next day to distribute religious newspapers. Early the next morning, January 1, 1968, Mahdi picked up Hastings and Hurston for the drive to Albany. Mahdi claimed that he needed to buy a few grocery items for his family before leaving for Albany. Mahdi drove to the Knox Street Market operated by Ernest Ladner, Sr., and Ernest Ladner, Jr., because he knew it would be open. Ladner, Sr., knew Mahdi well because Mahdi was a former neighborhood resident, a regular customer of the store, and once had painted the store.

Inside the store, Hastings and Hurston bought some fruit from Ladner, Sr., at the front counter while Mahdi went to the rear. Mahdi then returned to the front of the store with Ladner, Jr., and, holding a gun, demanded money. Ladner, Sr., testified that, after taking approximately $180 from him, Mahdi directed him and his son into the store refrigerator and ordered them to stay there for fifteen minutes. A few seconds later, Mahdi returned and told them that he would have to kill them. According to Ladner, Sr., Mahdi asked Hastings and Hurston what he should do, and then he shot both of the Ladners. Hastings and Hurston both, however, testified that they were already out of the store when Mahdi shot the victims.[8] Mahdi testified that he remembered taking the money, and the gun going off in his hand. He testified, however, that he could not recall anything else that occurred at the store, and anything thereafter, for about twenty minutes until he was on the Massachusetts Turnpike. Ladner, Jr., was immediately killed by a single gunshot; Ladner, Sr., survived three gunshot wounds.

Hastings testified that on the way from the market to the automobile, he asked Mahdi what had happened in the store. Mahdi stated that he had shot the Ladners, but, when asked why, he did not know. Mahdi then drove aim-

---

[8] The codefendants maintained that they had done nothing to stop the robbery and shooting because of their surprise and fear. On cross-examination, Hurston admitted that he had not made any effort to leave Mahdi's company following the shooting.

lessly around Springfield for twenty to thirty minutes, not saying anything. Mahdi eventually drove the automobile to Albany, still without talking. Once in Albany, they sold religious papers. In the only other conversation about the shooting, Hastings asked Mahdi what he intended to do, and Mahdi replied that he did not know. Hastings suggested that they return to Springfield. Upon returning to Springfield, Mahdi dropped Hastings and Hurston at their respective homes and returned to his own home.

Mahdi was arrested on January 2, 1968, after Ladner, Sr., identified him. On being given his Miranda warnings, Mahdi initially remained silent. Subsequently, he gave the police a written statement telling them where the weapon was located, authorizing a search of his house and garage, and giving fictitious names for Hastings and Hurston.

Mahdi retained counsel to represent him. On January 3, Hastings and Hurston went to Mahdi's counsel for legal advice and indicated their desire to surrender themselves to the police. Counsel gave them the names of several attorneys and said that he would represent them only for the purpose of surrender. On January 4, 1968, another attorney and Mahdi's counsel accompanied Hastings and Hurston to the Springfield police station. The other attorney told the police that Hastings and Hurston were the two men with Mahdi at the Knox Street Market. Thereafter, each codefendant was represented by separate counsel.

It was undisputed that Mahdi had committed the homicide. His sole defense was that he lacked the mental capacity to appreciate the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of law. The insanity defense was based on a claim that he was under stress because of fear of excommunication from his religious group for failing properly to provide for his family, his financial pressures, his lack of sleep caused by anxiety as to fulfilling his religious obligations, his family background, and his ill health.[9] On February 2, 1968, Mahdi was ordered

---

[9] Mahdi had been excommunicated once before for five months for failing to provide for his wife and family. He had six children by his second

by the trial judge to Bridgewater State Hospital to determine his competency to stand trial. After receiving the report of psychiatrists, the judge ordered the defendant returned to the Hampden County jail, and trial began on May 13, 1968.[10]

1. *Ineffective assistance of counsel.* The defendant contends that his convictions should be reversed because he was deprived of his constitutional right to effective assistance of counsel under the Sixth Amendment, applicable to the States through the due process clause of the Fourteenth Amendment to the Constitution of the United States, and art. 12 of the Declaration of Rights of the Constitution of the Commonwealth. See *Cuyler* v. *Sullivan,* 446 U.S. 335, 343-344 (1980); *Gideon* v. *Wainwright,* 372 U.S. 335 (1963).

a. *Standard to measure effectiveness of counsel.* We note, at the outset, that at the time of Mahdi's trial, counsel's assistance was held to be constitutionally inadequate when it was so deficient as to make the trial "a farce and a mockery of justice," when it created "an apparency instead of the reality of contest and trial," or when it "blotted out the substance of a defense." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), quoting *Matthews* v. *United States,* 449 F.2d 985, 994 (D.C. Cir. 1971) (Leventhal, J., concurring). *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 14 (1973). *Commonwealth* v. *Bernier,* 359 Mass. 13, 18 (1971), quoting *Scott* v. *United States,* 334 F.2d 72, 73 (6th Cir.), cert. denied, 379 U.S. 842 (1964). See *Commonwealth* v. *Rondeau,* 378 Mass. 408, 412 (1979); *Commonwealth* v. *Dunker,* 363 Mass. 792, 797-798 (1973). None of the defendant's allegations of the ineptitude of defense counsel would, if accepted, demonstrate that the conduct

wife, ranging from three to ten years of age. Mahdi was a skilled machinist who was painting houses for a living. He claimed to be suffering from nervousness and ulcers resulting from financial pressures.

[10] Motions for a change of venue and severance were denied by the trial judge. Because of wide pretrial publicity, an extensive jury pool was needed to create an impartial jury. Nevertheless, the trial judge took the time to ensure that the jurors were indifferent.

of defense counsel, standing alone, fell short of the minimal standards of performance in effect at the time of trial.

This court since has adopted a more lenient standard. See *Commonwealth* v. *Saferian, supra.* "After *Saferian,* a defendant need show only that the conduct of his lawyer was 'measurably below that which might be expected from an ordinary fallible lawyer.' . . . In addition to a showing of incompetence of counsel, our cases usually require a demonstration of prejudice resulting therefrom." *Commonwealth* v. *Rondeau, supra.* See *Commonwealth* v. *Harris,* 387 Mass. 758, 761-762 (1982).

Current counsel for the defendant and the Commonwealth have not briefed or argued the question whether the standard set forth in *Saferian* should be applied retroactively to this 1968 trial. Thus, we do not reach the question whether defense counsel fell short of the *Saferian* standard. The inadequacies of defense counsel are relevant, however, to our disposition of this appeal. This is so because this question, considered with the actions of the district attorney, is material to whether a fair trial was afforded the defendant. Consequently, we discuss briefly the claims of error stemming from the conduct of defense counsel.

b. *Performance of trial counsel.* At the trial, defense counsel presented only two witnesses, Mahdi and Dr. John W. Donoghue, a psychiatrist.[11] Trial counsel had arranged for the psychiatrist to examine Mahdi on the day before the start of the trial for slightly more than two hours. During cross-examination of one codefendant, trial counsel did not ask any questions about Mahdi's appearance and mental condition at the time of the shooting. He did not cross-examine the other codefendant at all, despite testimony that both codefendants had observed the defendant prior to, and subsequent to, the murder. Furthermore, trial counsel did not call any lay witnesses to support testimony about Mahdi's

---

[11] On cross-examination, the district attorney brought out the facts that the defense psychiatrist was not a diplomate or on the staff of any of the neighboring hospitals. Unlike the experts presented by the Commonwealth, the defense expert was not a neurologist.

alleged financial anxieties, stressful family background, religious fears, or other emotional difficulties.

During the direct examination of the defendant, while attempting to elicit the defendant's family background, the trial counsel, the district attorney, and the judge became entangled in argument as to the proper breadth of the questioning. Trial counsel was attempting to elicit information as to family background to lay a foundation for the expert witness's testimony. The district attorney continuously objected. Finally, in a discourse with the trial judge, trial counsel mentioned, "[p]erhaps my questions are poorly phrased." The district attorney immediately seized upon this choice of words as an opportunity to suggest that trial counsel was improperly defending Mahdi. Trial counsel immediately asked to move to the other side of the bench to prevent the jury from hearing any further discussion. Upon inquiry by the trial judge, defense counsel stated that he considered himself qualified to handle a capital case. There was no further inquiry by the judge.

A similar entanglement arose in the direct examination of the defendant's expert witness. Confusion reigned, with repeated objections and interruptions by the district attorney and lengthy colloquies between the district attorney, trial counsel, and the judge. By the time order had been restored, the defense psychiatrist was unable to form an opinion at one point and did not understand the question on another occasion. Eventually, the psychiatrist was permitted to testify that, based on his actual examinations and the hypothetical question, the defendant did not have the substantial capacity to appreciate the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of the law. His diagnoses of the defendant were that the defendant suffered a "severe character disorder with obsessive, compulsive trends, schizoid trends, and sociopathic trends, plus an acute condition on part of the date of January 1, 1968, which included a dissociational state, and a fugue state." He further stated that, in this acute state of dissociation, a person would appear to do

things in an outwardly consistent or normal manner." He felt that Mahdi was tortured by his religion.

The district attorney presented three expert witnesses. The first was the examining neuropsychiatrist at Bridgewater State Hospital. In connection with his assessment of the defendant's competency to stand trial, he had reported to the trial judge that Mahdi had a sociopathic personality disturbance and was an antisocial type with paranoid features primarily associated with his religious beliefs. Nevertheless, he testified that Mahdi did not have a serious mental illness or a defect in judgment and was well aware of his surroundings. On cross-examination by defense counsel, however, the prosecutor's psychiatrist admitted that he had not asked about or pursued Mahdi's membership in the Black Muslims. Counsel inquired if this witness testified on an average of once a week for the Commowealth. The district attorney objected but then withdrew the objection. Counsel did not press for an answer.

The second neuropsychiatrist presented by the district attorney had observed Mahdi, while another examined him, for half an hour on January 13, 1968, in the Hampden County jail with one codefendant and police officers present. There had been no examination about Mahdi's religious involvement by the questioning psychiatrist, who was not testifying. The witness supported the conclusion that Mahdi was aware of his actions on January 1, 1968.

The final neuropsychiatrist who testified for the prosecution had never examined Mahdi. His opinion was based exclusively on his observations of the defendant in the courtroom. In addition to agreeing with the other prosecution experts, he was also permitted to testify that he believed that, because "his motivation was to destroy evidence," Mahdi stated that he could not recall the events.

The defendant contends that trial counsel inadequately prepared and presented his insanity defense. He claims that it was improper to call only one expert witness when the district attorney presented three; that defense counsel erred in arranging so late for his expert witness to examine the

defendant; that, as a result of the late examination, defense counsel had not prepared adequately the expert witness for his testimony; that defense counsel mishandled the direct examination of the expert witness; and that failure to cross-examine both of the codefendants and call corroborating witnesses was an egregious error.

As we have stated, we need not examine these claims in any detail. It is sufficient to say that the preparation and presentation of the sole defense of insanity showed ineptitude. There is no question that considerable squabbling ensued during the direct examination of the sole expert witness for the defense. "Every experienced trial lawyer has been present to witness the undignified and exasperating squabbles which erupt at the conclusion of the hypothetical as originally presented." H.M. Goulett, The Insanity Defense in Criminal Trials § 63 (1965). "Objecting counsel lists all of the alleged omissions, misstatements and inclusions of facts not supported by the evidence. The other attorney debates each and every point. The court then sifts and sorts the multitude of claims and directs modifications which confound the witness as well as the jury." *Id.* Obviously, counsel could have done more to prepare the witness and himself and to polish the hypothetical. The actions of the district attorney and the failure of the judge to remove this interminable squabbling from the jury's knowledge contributed little to the furtherance of a determination of the truth.

The defendant also alleges that trial counsel failed adequately to serve as a strategist and tactician by failing to object to an entirely white jury or to request inquiry into the possible racial bias of jurors, by failing to object to prejudicial questions and closing argument commenting on racial and religious beliefs, and by failing to object to comments by the district attorney about Mahdi's exercise of his constitutional right to remain silent at the time of his arrest.

The victims were white. The defendant and both codefendants are black. One month prior to the trial, Martin Luther King had been assassinated. Even though the trial

occurred prior to our opinion in *Commonwealth* v. *Soares*, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979), the issue as to a racially biased jury is open here because this case is pending on direct appeal after the *Soares* decision. *Id.* at 493 n.38. Nevertheless, the record is inadequate to raise the issue of a racially biased jury. While there is some evidence of racial tension, the record does not disclose the racial composition of the jury pool or the seated jury. There is no evidence whether or not peremptory challenges were being used to affect the racial composition of the jury.

Last, as to the defendant's complaints about defense counsel's failure to object to prejudicial questions and closing argument, we need not determine whether this failure demonstrates ineffective assistance of counsel. We consider, instead, whether the conduct of the district attorney warrants reversal under the standard of review embodied in G. L. c. 278, § 33E.

2. *Prejudicial questioning and comments in closing argument by the district attorney.* The defendant contends that his convictions should be reversed because of racially and religiously inflammatory questioning and closing comments by the district attorney, *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975), and because the district attorney's comments violated his constitutional right under the Fifth Amendment to remain silent at the time of arrest, *Doyle* v. *Ohio*, 426 U.S. 610, 611 (1976).

a. *Failure to object.* Ordinarily, a defendant is not entitled to appellate review of alleged errors unless his rights are preserved by proper objection, which was not done. We will consider such errors, however, if there is a substantial risk of a miscarriage of justice. G. L. c. 278, § 33E. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149 (1982); *Commonwealth* v. *Cole*, 380 Mass. 30, 38-39 (1980).

The defendant argues, and we agree, that this is a case where there is a substantial risk of a miscarriage of justice. Under the broad discretionary power of review accorded to this court by G. L. c. 278, § 33E, we turn now to the defendant's complaints.

b. *Prejudicial questions and closing comments about racial origins and religious tenets.* At the close of his cross-examination of the defendant, the district attorney asked Mahdi about certain teachings of the Muslim religion which focused on concepts that the Commonwealth characterized in this appeal as "hateful" tenets.[12] The district attorney

---

[12] The actual exchange is as follows:

THE PROSECUTOR: "The principles and teachings of Islam, you believe in those, do you not?"

THE DEFENDANT: "Yes, sir, the religion of Islam and its principles and standards I believe in."

THE PROSECUTOR: "Right, and, as a matter of fact, at some time you became a member of this organization, there were certain principles that you were bound by and that were told to you and you adopted these as part of this religion, right?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: Certain teachings?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "Teachings?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "And there is what's called a Student's Enrollment, is there not?"

THE DEFENDANT: "That is correct. "

THE PROSECUTOR: "And those are the rules of Islam, right?"

THE DEFENDANT: "To some degree, yes."

THE PROSECUTOR: "And some of the things are the ties of the world and all this sort of thing, right?"

THE DEFENDANT: "You have to explain that, sir; what do you mean?"

THE PROSECUTOR: "In square miles. In Student Enrollment, aren't there a series of questions and answers?"

THE DEFENDANT: "That is correct."

THE PROSECUTOR: "And, for example, a question such as, Who was original man?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "And that part of the Student Enrollment, a series of questions and answers?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "Among them, What is original man?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "And you know what that is, and you still abide by that, do you not?"

THE DEFENDANT: "I don't understand what you mean."

THE PROSECUTOR: "Well, you tell us, who is original man? Give me the answer that your religion holds."

THE DEFENDANT: "You want the answer of who the original man is?"

THE PROSECUTOR: "Yes."

began and ended his closing argument with references to these religious beliefs about black and white people: "You know what explains this, don't you, this whole killing and everything else? They talk about the Islamic religion. This is what it is. Who is the colored man? The Caucasian Jacob's made devil, skunk of the [planet] earth. That's exactly what they thought of Mr. Ladner, Sr. and Jr."; "Who was the colored man? The Caucasian Jacob's made devil, skunk of the [planet] earth. That's what they thought of the Ladners, and that's what they thought of all of them, and they eliminated these two men, these two men and felt that they'd really succeeded in pulling off the robbery of the year . . . ."

The Commonwealth contends that, because the defendant opened the issue of his religious beliefs as part of his insanity defense, the district attorney was entitled to explore them fully. *Commonwealth* v. *Boyd*, 367 Mass. 169, 184-185

---

THE DEFENDANT: "The original man is the Asiatic black man."

THE PROSECUTOR: "Owner and maker, cream of the [planet] earth, father of civilization, God of the universe. Is that the answer?"

THE DEFENDANT: "That is the answer."

THE PROSECUTOR: "And this is something you believe in, right?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "And it says, in another one of the questions in Student's Enrollment, is Who is the colored man? Is that a question?"

THE DEFENDANT: "Yes, sir, that is a question."

THE PROSECUTOR: "And this is the answer, is it not (indicating)? That's the answer that's contained in your questions, right?"

THE DEFENDANT: "That's part of it."

THE PROSECUTOR: "Well, the part that's here is correct, right, and that is the Caucasian —"

THE DEFENDANT: "Go ahead."

THE PROSECUTOR: "Jacob's made definitely skunk of the [planet] earth?"

THE DEFENDANT: "That is part of the answer, yes."

THE PROSECUTOR: "And that's one of the tenets that you believe in?"

THE DEFENDANT: "Yes, sir."

THE PROSECUTOR: "I don't think I have any other questions."

It appears that the purpose of the section of the Student Enrollment Book from which the district attorney quoted is to teach the history of the planet Earth, and that the section gives no instructions with reference to behavior in society.

(1975). In *Boyd*, the prosecutor also queried the defendant about the goals of the Muslim religion. The questions in *Boyd*, however, were designed to challenge the genuineness of the defendant's religious zeal, on which the defendant's expert opinion of insanity largely was based. This court concluded that such questions were properly allowed within the trial judge's discretion on the issue of the credibility of the expert's opinion. Here, the district attorney's particular references to the racial tenets of the Muslim religion had no probative value on the issues of this trial. The only apparent purpose of such questioning was to inject racial hatred into the trial. Considering the potential for racial tension in this trial, the district attorney "owed a particular care in discharging his duty to seek justice and not merely a conviction by trying the case factually and dispassionately without inflammatory tactics." *Commonwealth* v. *Smith*, 387 Mass. 900, 905 (1983).

Even assuming arguendo that the questions of the district attorney were acceptable under the holding of *Boyd*, the references in the closing argument clearly went beyond the boundaries of proper summation. There was nothing in the evidence which would sustain an argument that Mahdi committed the crimes because of either racial hatred or religious fanaticism. References to race or national origin principally to inflame jurors or appeal to their racial or ethnic prejudices or fears constitute prosecutorial misconduct. See *Commonwealth* v. *Graziano, supra* at 332. Even where the prosecutor takes his cue from defense counsel, we have held such references to be beyond permissible limits. *Id.* Appeals to racial, religious, or ethnic prejudices are especially incompatible with the concept of a fair trial because of the likelihood that such references will "sweep jurors beyond a fair and calm consideration of the evidence." *Id.*, quoting *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926). See *Commonwealth* v. *Shelley*, 374 Mass. 466, 470 (1978). Cf. *Commonwealth* v. *Johnson*, 372 Mass. 185, 197 (1977).

c. *Improper questions and closing comments about the defendant's silence after arrest.* During his direct examination of the arresting police officer, the district attorney inquired what Mahdi had said after being advised of his Miranda rights. The witness responded that Mahdi had stated, "I prefer to remain mute." Later, in his summation, the district attorney commented on the defendant's choice to remain silent as a means of inferring sanity: "[W]hen told by [the police officer] why he was under arrest, and when he said, For the murder of Ladner and the shooting of the son [*sic*], and he said, Do you want to say anything about it? I prefer to remain mute. Pretty intelligent, pretty cute answer for a guy that wasn't aware. Why didn't he then pour his heart out and say, I blacked out, I didn't know what happened. He knew what happened, and so did the other two, and when he was arrested, they then fell right into place."

There is no question that, under the fundamental principles of jurisprudence, evidence of a criminal defendant's postarrest, post-Miranda silence cannot be used for the substantive purpose of permitting an inference of guilt,[13] and that taking the witness stand does not constitute a waiver of that constitutional right. *United States* v. *Hale*, 422 U.S. 171, 175, 181 (1975). See *Commonwealth* v. *Mosby*, 11 Mass. App. Ct. 1, 5 (1980); *Commonwealth* v. *Bennett*, 2 Mass. App. Ct. 575, 579 (1974). In *Doyle* v. *Ohio*, 426 U.S. 610 (1976), the United States Supreme Court broadened this principle by concluding that the due process clause forbids the use of such evidence for the purpose of impeaching an exculpatory story.[14] *Id.* at 619. This court also has held that comments on postarrest statements indicating a defendant's intention to exercise his or her right

---

[13] Compare *Jenkins* v. *Anderson*, 447 U.S. 231, 238 (1980) (Fifth Amendment is not violated, however, by use of prearrest silence).

[14] Compare *Raffel* v. *United States*, 271 U.S. 494, 499 (1926) (Fifth Amendment not violated when the defendant was impeached by silence at first trial while testifying at second trial).

to remain silent are equally unacceptable. *Commonwealth v. Cobb*, 374 Mass. 514, 518 (1978).[15]

The Commonwealth contends that evidence of sufficient lucidity to exercise the right to remain silent has particular probative value to show state of mind. Thus put, the question appears to be: May a prosecutor use evidence of a defendant's exercise of his or her Miranda rights, not to infer guilt nor to impeach an exculpatory story, but rather, to infer sanity? We question the probative value of the exercise of one's Miranda rights to indicate sanity. Insanity is not the equivalent of stupidity. Mahdi's preference to remain silent may have been nothing other than an indication of his intelligence, as the district attorney himself pointed out.

Nevertheless, assuming arguendo that there is some probative relationship between sanity and the exercise of one's constitutional rights, we fail to see how use of evidence to infer sanity substantively differs from use to infer guilt or use for impeachment purposes. The ultimate constitutional right at issue is still the right to remain silent. *Doyle* held that the exercise of one's Miranda rights could not be used for impeachment purposes for two reasons: (1) the inherent ambiguity of silence "because of what the State is required to advise the person arrested"; and (2) the implicit assurance of the Miranda warnings that the defendant's exercise of the announced right will carry no penalty. *Doyle* v. *Ohio*, *supra*, at 617-618. Such ambiguity does not change simply because the warnings are given to a person who exercised such rights and later claims to have been legally insane at the time of the crime. Fundamental unfairness results from the use of evidence of such silence regardless whether the person exercising his or her constitutional right to remain silent claims insanity as a defense. See *Sulie* v. *Duckworth*, 689 F.2d 128, 131-132 (7th Cir. 1982) (Cudahy, J., dissent-

---

[15] The right of a defendant in custody to remain silent is a long-established part of our common law. See *Commonwealth* v. *Kenney*, 12 Met. 235, 237-238 (1847). Nor may reliance on a constitutional right be used to create inferences adverse to a defendant. *Commonwealth* v. *Burke*, 339 Mass. 521, 532-533 (1959).

ing); *People* v. *Schindler,* 114 Cal. App. 3d 178, 186-187 (1980). Thus, we conclude that the defendant's constitutional right to remain silent was violated by the district attorney's questions and closing comments. Cf. *Commonwealth* v. *Smith,* 387 Mass. 900, 908-909 (1983). Nevertheless, our analysis does not end here.

"Both *Hale* and *Doyle* suggested, however, that in some instances prosecutorial comment on post-arrest silence, although unconstitutional, might constitute a harmless error under the standard of *Chapman* v. *California,* 386 U.S. 18 . . . (1967)." *Morgan* v. *Hall,* 569 F.2d 1161, 1166 (1st Cir.) cert. denied, 437 U.S. 910 (1978). See *Commonwealth* v. *Cobb, supra* at 521; *Commonwealth* v. *Mosby, supra* at 9; *Commonwealth* v. *Bennett, supra* at 582. The prosecutor's unconstitutional conduct, however, must be harmless beyond a reasonable doubt. See *Chapman* v. *California,* 386 U.S. 18, 24 (1967); *Commonwealth* v. *Cobb, supra* at 522; *Commonwealth* v. *Bennett, supra.* As the reviewing court, we must assess the record as a whole to determine the probable impact of the improper comments and evidence on the jury. *Morgan* v. *Hall, supra.* See *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 316 (1973). In this assessment, we include the performance of defense counsel and the manner and circumstance in which this trial was conducted.

In determining whether or not an error is harmless by weighing the prejudicial effect of the improper evidence, there are several factors which this court and others have considered: (1) the relationship between the evidence and the premise of the defense; [16] (2) who introduced the issue at

---

[16] See *Commonwealth* v. *Mosby,* 11 Mass. App. Ct. 1, 9 (1980) (not a case where subject of improper argument "only remotely or collaterally related to ultimate issue of guilt"); *Commonwealth* v. *Bennett,* 2 Mass. App. Ct. 575, 582 (1974) (improper testimony used to impeach crucial testimony); *Morgan* v. *Hall,* 569 F.2d 1161, 1167 (1st Cir. 1978) (improper testimony was calculated to damage defense); *People* v. *Schindler,* 114 Cal. App. 3d 178, 190 (1980) (improper to use exercise of right to remain silent to show state of mind when only issue was defendant's mental capacity).

trial;[17] (3) the weight or quantum of evidence of guilt;[18] (4) the frequency of the reference;[19] and (5) the availability or effect of curative instructions.[20]   See *Williams* v. *Zahradnick,* 632 F.2d 353, 361-362 (4th Cir. 1980).   These factors are not exclusive or exhaustive. *Id.* Nevertheless, this scoreboard method to distinguish harmless from harmful error is useful.

The evidence of Mahdi's postarrest silence was being used by the district attorney to strike at the jugular of the defendant's insanity defense.   The evidence was an issue in-

---

[17] See *Bradford* v. *Stone,* 594 F.2d 1294, 1296 (9th Cir. 1979) (defense counsel, by dwelling on justifications for silence, opened door for prosecutor to suggest contrary inferences); *United States* v. *Lopez,* 575 F.2d 681, 685 (9th Cir. 1978) (defense counsel first placed issue before jury). But see *Morgan* v. *Hall, supra* at 1168 (defense counsel only exposed fact of silence, but prosecutor improperly used evidence to undermine defendant's story).

[18] See *Commonwealth* v. *Cobb,* 374 Mass. 514, 522 (1978) (impact of erroneously admitted statements is not trivial when sum of evidence is not overwhelming); *Bradford* v. *Stone, supra* at 1296-1297 (harmless error when evidence against defendant overwhelming and alibi inconclusive and uncorroborated); *United States* v. *Edwards,* 576 F.2d 1152, 1155 (5th Cir. 1978) (harmful error when evidence is thin); *United States* v. *Lopez, supra* at 685; *Morgan* v. *Hall, supra* at 1167-1168 (harmless error when overwhelming evidence of guilt); *Chapman* v. *United States,* 547 F.2d 1240, 1249 (5th Cir.), cert. denied, 431 U.S. 908 (1977) (evidence of guilt so strong and story so implausible, error held harmless beyond reasonable doubt).

[19] See *Williams* v. *Zahradnick,* 632 F.2d 353, 365 (4th Cir. 1980) (harmful error when prosecutor made not one but four references to defendant's silence); *Chapman* v. *United States, supra* at 1249-1250 (harmless error when single reference to silence was neither repeated nor linked to exculpatory story).

[20] See *Commowealth* v. *Cobb, supra* at 521 (prejudicial remarks reached jury with full force and without potentially countervailing influence of cautionary instructions by judge); *Commonwealth* v. *Mosby, supra* at 9-10 (judge's instructions insufficient to cure prosecutor's error); *Commonwealth* v. *Bennett, supra* at 582 (error to permit prosecutor's attack in view of emphasis placed on defendant's silence in judge's charge); *Morgan* v. *Hall, supra* at 1168 ("[i]n no case has a prompt and forceful instruction alone been held sufficient to vitiate the use of postarrest silence").

troduced and pursued by the district attorney.[21] The district attorney made not one, but two, separate references to the defendant's exercise of his Miranda rights. The prosecutorial comments were a matter to which the trial judge gave no curative instructions. All these indicators would point to a harmful error classification. To balance these, however, is the strong evidence of Mahdi's guilt.

The weight of the evidence alone is not sufficient, however, to make the district attorney's comments harmless error. The nature of a *Doyle* error is so egregious that reversal is the norm, not the exception. See *Williams* v. *Zahradnick, supra* at 363; *United States* v. *Edwards.* 576 F.2d 1152, 1155 (5th Cir. 1978); *Chapman* v. *United States*, 547 F.2d 1240, 1250 (5th Cir. 1977). The sole issue during the trial was the responsibility of the defendant for his actions. Mahdi admitted that he had robbed and shot the Ladners. The thrust of the improper comments went to the issue of sanity. The appropriate factor to consider, therefore, is the weight of the evidence that related to the issue of sanity. The psychiatric testimony was conflicting. The defense psychiatrist testified that Mahdi did not have the necessary mental capacity to understand his actions. The defendant testified to his lack of recollection. The insanity defense was not forcefully presented to the jury by defense counsel. We cannot say beyond a reasonable doubt that the jury would have reached the same conclusion had the district attorney not made his improper comments. "In so doing we note that the comment upon silence of the accused is a crooked knife and one likely to turn in the prosecutor's hand. The circumstances under which it will not occasion a reversal are few and discrete. We suggest that it be abandoned as a prosecutorial technique." *United States* v. *Edwards, supra.*

3. *Conclusion.* We conclude that the exploitation of the defendant's exercise of his Miranda rights, coupled with the improper questions and argument on the Muslim religion,

---

[21] The defense counsel attempted to defuse the prosecutor's question by eliciting more information about the defendant's silence.

must be deemed harmful error. Our review of this record leads us to the conclusion that there was a substantial risk of a miscarriage of justice. Accordingly, the judgments are reversed, and the verdicts set aside. As to the companion case, the appeal is dismissed.

*So ordered.*