Barry N. BEHN, Barry N. Behn as Administrator of the Estate of Adam Behn, and Diana Behn, Plaintiffs,

v.

LEGION INSURANCE COMPANY, Defendant.

No. 99–11746–EFH.

United States District Court, D. Massachusetts.

Nov. 30, 2001.

Terrence P. Perry, Brendan J. Perry & Associates, PC, Holliston, MA, for Barry N. Behn.

Jennifer L. Boyd, Hunter & Associates, P.C., Claudia A. Hunter, Hunter & Bobit, P.C., Boston, MA, for Legion Insurance Company.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

Plaintiffs Barry N. Behn[1] and Diana Behn bring this suit against Legion Insurance Company ("Legion"), a Pennsylvania corporation, claiming that Legion violated Massachusetts law in failing to settle a wrongful death/medical malpractice action brought by the Behns on behalf of their son, Adam Behn, against Dr. Robert Tufo, who was insured by Legion. Counts I through IV of the complaint assert that Legion violated Massachusetts General Laws, Chapters 93A and 176D by failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; refusing to pay claims without conducting a reason-

---

1. Both individually and as administrator of the estate of Adam Behn.

able investigation based upon all available information; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; and failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement. Count V asserts that Legion failed to grant relief upon receiving the plaintiff's Chapter 93A demand letter. Count VI asserts that Legion breached its insurance contract with Doctor Tufo and its duty to the Behns as third-party beneficiaries, and counts VII and VIII assert claims for intentional infliction of emotional distress. All counts were tried to the bench and this Memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. Adam Behn's Background and Involvement with Doctor Tufo

Adam Behn, son of the plaintiffs, was born on June 27, 1966. He had an older brother, Eric, and a younger sister, Sara. Adam worked at a photography studio which his parents had purchased, and earned between $300 and $350 per week. He had a long history of substance abuse and self-destructive behavior. For example, he smoked marijuana for the first time at age twelve, and was drinking heavily by the end of high school. He had incidents of alcohol and drug abuse that required inpatient treatment as early as 1987. He used marijuana, cocaine and speed in the presence of other family members, and totaled two automobiles and crashed a third while under the influence of alcohol.

Adam began attending Narcotics Anonymous after a Spring, 1988 incident in the Florida Keys while living with his brother Eric. Eric described Adam as out of con-

trol on drugs and/or alcohol and driving his car at speeds up to 100 miles an hour. This incident resulted in a stay in a detoxification facility at Naples Community Hospital followed by Adam's return to Massachusetts. Adam attended Narcotics Anonymous meetings in Massachusetts until sometime in 1989 and remained clean and sober during that time.

At some point in 1989, however, Adam stopped going to Narcotics Anonymous meetings and resumed using drugs and alcohol. Around the same time, Adam began living with Debra Mancini, whom he had met at Narcotics Anonymous and who also had substance abuse problems and was a source of Adam's illegal drugs. His parents did not approve of this relationship, both because Narcotics Anonymous cautions against recovering drug addicts living together, and because she was more than twice Adam's age and had two children. Adam also maintained a bedroom at his parents' home as well, and would spend time there when he was not getting along with Mancini.

On February 27, 1990, Adam came to Norwood Hospital after attempting suicide by cutting his left wrist. After receiving medical treatment, he was referred to Doctor Tufo, a psychiatrist who was affiliated with the hospital. After their initial meeting that day, Doctor Tufo scheduled regular weekly meetings with Adam. Doctor Tufo treated Adam for both drug abuse and acute depression. Adam for the most part kept his weekly appointments with Doctor Tufo after the start of treatment in February. On April 16, 1990, during the period of treatment with Doctor Tufo, Adam was hospitalized at Norwood Hospital for taking a combination of alcohol, valium and codeine. He was discharged on April 27, 1990. Adam continued treatment with Doctor Tufo after the incident.

Over the course of the treatment period, Doctor Tufo prescribed a number of medications, including Tranxene, Pamelor, Mellaril, Librium, Amantadine and Loxitane. On August 16, 1990 Doctor Tufo prescribed Pamelor for Adam's long-standing depression. He gave Adam a prescription for 30 Pamelor tablets, 25–milligram size, with one refill, and told him to take one tablet three times a day. The original prescription and the refill were filled. At his August 22, 1990 meeting with Doctor Tufo, Adam told Doctor Tufo that he was envisioning suicidal plans which included using exhaust from an automobile, taking antabuse and beer, or overdosing on pills to kill himself. As a result, Adam was committed to an inpatient facility at Norwood Hospital from August 23 to August 31, 1990. During his stay, Doctor Pincus, a psychiatrist, continued to administer Pamelor to Adam. On September 5, 1990, Doctor Tufo saw Adam for his regularly scheduled appointment. Doctor Tufo gave Adam a prescription for 100 Pamelor tablets, 50–milligram size, with one refill, and told Adam to take two tablets at bedtime. The original prescription was filled, but the refill was not. On September 12, 1990, Doctor Tufo gave Adam a prescription for 10 Pamelor in the 25–milligram size, and four samples of the 25–milligram size, with instructions to take two tablets each day.

On or about September 17, 1990, Adam called to cancel his September 19, 1990 appointment. He told Doctor Tufo that he had switched to Medical East, a more restrictive health maintenance organization, and would be seeing another psychiatrist that was covered by the new plan. Adam's parents had also become concerned that Doctor Tufo was prescribing too much medication and believed that Adam's condition was worsening as a result. Part of their concern was due to the fact that, during his treatment with Doctor Tufo, Adam carried a large quantity of medication in a duffel bag and kept it with him at all times, whether he was staying at Debra Mancini's house or his parents' house.

On September 24, 1990, Adam was admitted to the Arbour Hospital in Boston on a voluntary basis for treatment of depression and auditory hallucinations with suicidal content. On September 27, 1990, Adam checked himself out of the Arbour and an appointment was arranged at Medical East with a substance abuse specialist for the day following discharge. The substance abuse specialist was Robert Markum. As part of Adam's treatment, Mr. Markum took him off of all medication. In October, Adam and his mother together flushed what Mrs. Behn believed was all of the medication he carried in the large duffel bag down the toilet, and destroyed all of the pill bottles. Unknown to Mrs. Behn, Adam retained a secret supply of medication.

Doctor Tufo spoke with Mrs. Behn over the phone in October, 1990, during which no problems with the transfer of care were reported. Doctor Tufo never heard from Adam or any other member of the Behn family after the October, 1990 telephone conversation. On December 31, 1990, Adam had to be hospitalized after a drug and alcohol binge. On January 29, 1991, Adam committed suicide by taking 50 tablets of the medication Pamelor. Mrs. Behn testified that she saw the pill bottle and that the Pamelor was prescribed by Doctor Tufo. The bottle was not recovered after the emergency medical technicians brought it with them to the hospital.

### B. *The Underlying Wrongful Death/Medical Malpractice Action*

In December, 1993, the Behns filed a wrongful death action against Doctor Tufo in Middlesex Superior Court. Legion was

Doctor Tufo's professional liability insurer through the American Psychiatric Association ("APA"). The insurance policy had a limit of $1,000,000 and a consent to settlement provision that allowed Doctor Tufo to refuse to settle any malpractice claims. Professional Risk Management Services ("PRMS") acted as third-party administrator for Legion and was responsible for securing counsel for the insured and for the handling, investigation, and settlement of professional liability claims filed against APA insureds, including Doctor Tufo. Doctor Tufo informed PRMS on January 18, 1994 that a suit had been filed. PRMS assigned the case to Mary Morrissey Sullivan of the law firm of Sullivan, Sullivan & Pinta on January 18, 1994. At the time, Attorney Sullivan had approximately 22 years of experience defending medical malpractice cases, including wrongful death suicide cases. Sullivan, Sullivan & Pinta was on PRMS' list of approved counsel for handling cases against APA insureds in Massachusetts since the mid-to-late 1980s. During the time she handled the lawsuit, Attorney Sullivan kept PRMS informed of the case status.

After reviewing the case file, Attorney Sullivan consulted with Doctor Tufo. Doctor Tufo believed he had complied with the standard of care, wanted the opportunity to clear his name, and did not want to settle the case. Attorney Sullivan then contacted Dr. Barry Gault, a board certified psychopharmacologist, who told her that the malpractice action did not involve issues of psychopharmacology. She then contacted Dr. Bernard Katz, a board certified psychiatrist, to review Doctor Tufo's treatment records. Attorney Sullivan had consulted Doctor Katz on a number of medical malpractice cases, and trusted him because he was not afraid to tell her when her client had committed malpractice and she needed to settle the claim. Doctor Katz formed the professional opinion that

Doctor Tufo had complied with the standard of care in his treatment of Adam, and that there was nothing in Doctor Tufo's treatment that was causally related to Adam's suicide. Doctor Katz told Attorney Sullivan that he thought Doctor Tufo had established a reasonable therapeutic alliance and had kept Adam in therapy where others had failed. He believed that Adam died from alcohol and substance abuse, not medical malpractice. Attorney Sullivan relied on Doctor Katz's opinion and thought he would come across as a credible witness. Attorney Sullivan also believed that the Behns' expert, Doctor Bursztajn, was not a credible witness, based on her prior experience with him in other trials. Her assessment was in part due to his willingness to testify as an expert on a variety of topics beyond medical malpractice, including criminal responsibility, diminished capacity, and products liability.

After taking the depositions of family members and consulting the above parties, counsel from Sullivan, Sullivan & Pinta reported to PRMS that they believed that there was a 60 percent chance of a defense verdict. Counsel based this opinion on a number of factors: Doctor Katz's opinion that Doctor Tufo had complied with the standard of care in his treatment of Adam; the gap between Adam's last appointment with Doctor Tufo on September 12, 1990, and Adam's suicide on January 29, 1991, while under someone else's care; and the fact that the case was a suicide. Counsel also reported that even if there was a plaintiff's verdict, there was a strong probability that the jury would find comparative negligence on the part of Adam, due to the fact that it was a suicide case.

On or about September 20, 1995, Attorney Sullivan received a demand from the plaintiffs for $1,700,000. This demand was not made in the form of a Chapter 93A

demand letter, but was rather an offer to settle the lawsuit. The demand letter stated that the offer to settle would expire at 5:00 P.M. on October 20, 1995. Attorney Sullivan recommended to PRMS that Legion make no offer of settlement, and no offer of settlement was made.

On March 20, 1997, on the eve of trial, the Behns made a second demand for settlement for the policy limits of $1,000,000. Attorney Sullivan conveyed the settlement demand to PRMS and then informed the Behns' counsel that the policy limits would not be offered.

A jury trial was held in Middlesex Superior Court in March and April, 1997. On April 11, the third day of jury deliberations, Legion offered $200,000 to settle the case, with Doctor Tufo's consent. The Behns rejected this offer. Later that day, the jury returned a verdict in favor of the Behns and awarded damages in the amount of $1,153,900. The jury found Adam to be 25 percent negligent. The comparative negligence verdict reduced the total damages to $915,425.

The parties reached a settlement on the verdict before the jury was to return for further deliberations on punitive damages based on its finding that Doctor Tufo's misconduct was willful and wanton. Under the agreement, Legion would pay the policy limits of $1,000,000 on behalf of Doctor Tufo, and Doctor Tufo would pay an additional $380,000 out of his own pocket. This agreement for judgment was signed by Christopher Perry, Counsel to the Behns; Barry Behn as administrator of the estate of Adam Behn and individually; Diana Behn; David Feakes as Counsel for then-Defendant Doctor Tufo, and was approved by Judge Botsford. The agreement was not signed by Legion, nor was Legion a party to the underlying action.

## C. *The Chapter 93A Demand Letter*

On August 12, 1998, counsel for the Behns sent Legion a Chapter 93A demand letter, stating that Legion's failure to settle the medical malpractice case against Doctor Tufo constituted a willful and/or knowing violation of Chapter 93A, Section 2. Specifically, the letter asserted that Legion engaged in unfair or deceptive trade practices in the business of insurance; failed to adopt and implement reasonable standards in the prompt investigation of claims arising under insurance policies; refused to pay claims without conducting a reasonable investigation based upon all available information; failed to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; attempted to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; and failed to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement, in violation of Mass.Gen.L. ch. 176D, §§ 3(9)(c), (d), (f), (h) and (n), respectively. They asserted that these violations were concurrent violations of Mass.Gen.L. ch. 93A, § 9. The letter also asserted that Legion's behavior was an oppressive or unconscionable act or practice; failed to comply with existing statutes; and violated the Federal Trade Commission Act, in violation of 940 C.M.R. §§ 3.16(1), (3), and (4), respectively.

The demand letter asked for $1,680,844.25 for Legion's failure to make a settlement offer in violation of the above statutes and regulations. This figure included: $1,000,000 plus 12 percent interest from May 10, 1994, when the Behns believe liability became reasonably clear, to

approximately May 14, 1997, when Legion paid its policy limits of $1,000,000 on behalf of Doctor Tufo pursuant to the agreement for judgment; emotional distress damages in the amount of $300,000; and $20,844.25 in estimated costs and expenses for bringing the underlying lawsuit.

On September 10, 1998, Legion rejected the demand letter. Legion stated that liability in the underlying case was never reasonably clear, and that there were significant issues of causation and damages suggesting a more than reasonable prospect of success at trial. Legion further stated that these issues of causation and damages were backed up by the reasonable opinion of an experienced expert witness, which supported Legion's decision not to settle. Legion also pointed out that Doctor Tufo did not consent to any settlement prior to April 11, 1997, and that immediately following Doctor Tufo's consent, Legion made an offer that was reasonable under the circumstances, while the Behns refused to accept any amount below the policy limits. The rejection also noted that the demand letter did not set forth a proper basis for the damages claimed.

The Behns now bring this action based on Legion's handling of the claim in the underlying suit and its failure to pay their Chapter 93A demand.

## II. CONCLUSIONS OF LAW

### A. Procedural Issues

Legion raises two procedural issues that it believes prevent this suit from being properly before this Court. It argues that the settlement in the underlying case against Doctor Tufo bars this suit against Legion, and that the statute of limitations for the actions based on Chapter 93A ran

on May 10, 1998, before this action was filed.[2]

### (1) Accord and Satisfaction

■ Legion argues that this lawsuit is in violation of the agreement for judgment in the underlying case. The Agreement provides, "the parties to this Agreement are desirous of executing this Agreement to resolve all legal and equitable issues which have arisen, could or will arise between and amongst them." Since the Behns failed to carve out a specific exception in their settlement agreement to bring the Chapter 93A claim, Legion argues that they cannot now bring this suit. Legion, however, was not a party to either the underlying case or the agreement for judgment, and cannot enforce its benefits. Although Legion paid $1,000,000 to the Behns on behalf of Doctor Tufo, that was in its capacity as Doctor Tufo's insurer and was paid to discharge Doctor Tufo's liability in the underlying malpractice case. The accord and satisfaction bars further action against Doctor Tufo relating to his treatment of Adam, but does not bar this suit against Legion for its failure to settle the insurance claim.

### (2) Statute of Limitations

■ Legion also asserts that the counts brought under Chapters 93A and 176D are barred by the applicable four-year statute of limitations. This argument fails. Legion correctly points out that the plaintiffs refer throughout their pleadings to liability becoming reasonably clear on May 10, 1994. The statute, however, does not begin to run until the plaintiff knew or should have known of appreciable harm resulting from the defendant's actions. *Schwartz v. Travelers Indemnity Co.*, 50

---

**2.** Legion concedes that it would be procedurally permissible for a plaintiff to send a Chapter 93A demand letter after the claim itself has been resolved by litigation, so this Court does not address that issue here.

Mass.App.Ct. 672, 678, 740 N.E.2d 1039 (2001). Although liability may have seemed reasonably clear to the plaintiffs on May 10, 1994, the Chapters 93A and 176D claims arise from Legion's behavior from the time it learned of this allegedly clear liability and its failure to take subsequent action. The Behns assert that they were not aware that the insurance company had no intention of paying their claim until after Legion failed to respond to their settlement demand in September, 1995, and Legion has offered no evidence to contradict this assertion. This means the claim would not be barred until after September, 1999. The Behns filed suit in July, 1999. Therefore, Legion's statute of limitations argument fails.

### B. *Substantive Claims*

#### (1) *Chapter 93A/176D*

In counts I through IV, the Behns assert that Legion's actions in failing to settle the case violated Chapter 176D [3] by failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; refusing to pay claims without conducting a reasonable investigation based upon all available information; failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; and failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement. Mass.Gen.L. ch. 176D, §§ 3(9)(c), (d), (f) and (n). The Behns also assert in count V that Legion failed to grant relief upon receiving their demand letter pursuant to Mass.Gen.L. ch. 93A, §§ 2, 9.

Chapters 93A and 176D were enacted "to encourage settlement of insurance claims ... and discourage insurers from forcing claimants into unnecessary litigation to obtain relief" when liability is reasonably clear. *Hopkins v. Liberty Mutual Ins. Co.*, 434 Mass. 556, 567–68, 750 N.E.2d 943 (2001). Whether the insurer's liability is "reasonably clear" calls for an objective inquiry into the facts and the applicable law. *Demeo v. State Farm Mutual Auto. Ins. Co.*, 38 Mass.App.Ct. 955, 956, 649 N.E.2d 803 (1995). "The test is not whether a reasonable insurer might have settled the case within the policy limits, but rather whether no reasonable insurer would have failed to settle the case within the policy limits." *Hartford Casualty Ins. Co. v. New Hampshire Ins. Co.*, 417 Mass. 115, 121, 628 N.E.2d 14 (1994). "So long as the insurer acts in good faith, the insurer is not held to standards of omniscience or perfection...." *Bolden v. O'Connor Café*, 50 Mass.App.Ct. 56, 67, 734 N.E.2d 726 (2000). The relevant inquiry is what the insurance company reasonably believed at the time in question, not what the jury ultimately found. *Id.*

Even if an insurer has not completed its investigation when it rejects a demand, if it is later shown that liability is not reasonably clear, the plaintiffs have not been adversely affected and there is no violation of Chapter 176D. *Van Dyke v. Saint Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 677–78, 448 N.E.2d 357 (1983); *see also Ferrara & DiMercurio, Inc. v. Saint Paul Mercury Ins. Co.*, 169 F.3d 43, 57 (1st Cir.1999). Liability in this context encompasses both fault and damages. *Clegg v. Butler*, 424 Mass. 413, 421, 676 N.E.2d 1134 (1997). This means that if

---

**3.** Although Chapter 176D does not grant a private right of action, a plaintiff can bring an action under Chapter 93A for violations of 176D, as the Behns do here. *O'Leary–Alison v. Metro. Prop. & Cas. Ins. Co.*, 52 Mass.App. Ct. 214, 214 n. 1, 752 N.E.2d 795 (2001).

either fault or damages are contested in good faith, liability is not reasonably clear. *See id.*

 In this case, the Court finds that liability in the underlying medical malpractice action was never reasonably clear. Legion was told by experienced trial counsel that there was a 60 percent chance of a defense verdict, and that even if there was a plaintiffs' verdict, there was a strong likelihood that the jury would find comparative negligence. While the Behns ultimately prevailed at the underlying trial, Legion could reasonably rely on the opinion of experienced counsel in deciding not to settle the case, *Van Dyke,* 388 Mass. at 677, 448 N.E.2d 357, and did not violate Chapter 176D merely because it lost at trial. *Bolden,* 50 Mass.App.Ct. at 67, 734 N.E.2d 726. Attorney Sullivan told Legion, through PRMS, that there were several bases for Legion to contest liability. The Court finds those bases, and Legion's reliance upon them, to be reasonable. Specifically, the Court finds that there was a reasonable basis for Legion to contest that Doctor Tufo deviated from the standard of care in his treatment of Adam. Furthermore, even if Doctor Tufo did in fact deviate from the standard of care, there was a reasonable basis for Legion to contest causation because Adam voluntarily terminated treatment with Doctor Tufo almost five months before he committed suicide, and was under the treatment of a different therapist when he committed suicide. Finally, even if Doctor Tufo deviated from the standard of care, and that deviation caused Adam to commit suicide, Legion had a reasonable basis to contest the amount of damages based on a reasonable expectation of a jury finding of comparative negligence. These issues gave Legion reasonable bases to contest liability, and made it reasonable to refuse to settle the Behns' claim.

(a) *The Standard of Care*

 Legion had a reasonable basis for arguing that Doctor Tufo complied with the standard of care in his treatment of Adam, because it had received independent advice to that effect from a psychiatrist who agreed to testify as an expert witness. When an insurer receives independent advice from an expert witness that suggests a reasonable probability of success on the merits, then liability is not reasonably clear. *See Van Dyke,* 388 Mass. at 677, 448 N.E.2d 357. Attorney Sullivan contacted a psychopharmacologist, Doctor Gault, who told her that Adam's case did not involve issues of psychopharmacology. She then contacted Doctor Katz, an experienced, board-certified psychiatrist with whom she had consulted on previous medical malpractice cases and whom she had used as an expert witness in the past. Attorney Sullivan testified that she had faith in Doctor Katz's opinion because in the past he had not been afraid to tell her when doctors deviated from the standard of care and that she should settle those cases. In this case, Doctor Katz reviewed Doctor Tufo's treatment notes and told Attorney Sullivan that Doctor Tufo's treatment complied with the standard of care, and that he was willing to so testify in court. Attorney Sullivan relied on the advice she received from Doctor Katz in evaluating the case. I find Attorney Sullivan's reliance on Doctor Katz's review to be reasonable.

The Behns argue that it was not reasonable for Attorney Sullivan to rely on Doctor Katz's review. They believe that their own expert, Doctor Bursztajn, was a more reliable expert, that he testified that Doctor Tufo deviated from the standard of care, and that if Attorney Sullivan had taken Doctor Bursztajn's deposition, she would have realized that Doctor Tufo was

negligent and would have settled the case.[4] The Court finds this argument unpersuasive. In every medical malpractice case, the plaintiff must produce a doctor to testify that the defendant doctor's treatment did not meet the standard of care. That does not mean that every defendant doctor has committed malpractice. Nor do the paper qualifications of experts automatically determine the outcome of medical malpractice cases. Certainly an insurance company is not required to settle a case upon a showing that the plaintiff's expert has a longer and more distinguished *curriculum vitae* than the defense expert. Attorney Sullivan had prior experience in court with Doctor Bursztajn, and believed that he would be an unpersuasive expert. Although she was ultimately incorrect in her assessment of whether the jury would find Doctor Bursztajn's testimony persuasive, that does not mean that her belief was unreasonable.

The Behns also argue that it was unreasonable for Attorney Sullivan to rely on Doctor Katz because Doctor Katz and Doctor Tufo knew each other as professionals. This Court disagrees. Legion's insurance expert, Barbara Staples, testified that this happens all the time, and that it would be nearly impossible to find psychiatrists to testify as expert witnesses with no professional connection to a given defendant within a given community. The Court agrees, and finds that Attorney Sullivan's reliance on an experienced, board-certified psychiatrist with whom she had previously consulted in successful medical malpractice defenses was reasonable in this case. The Court further finds that this reliance gave Attorney Sullivan a reasonable basis to contest whether Doctor Tufo had complied with the standard of care.

### (b) *Causation*

Legion also reasonably contested whether Doctor Tufo's treatment caused Adam's suicide. Assuming *arguendo* that Doctor Tufo had deviated from the standard of care in his treatment of Adam, there are still a number of reasonable bases for Legion to contest causation. Adam had a long history of alcohol and drug abuse and of other self-destructive behavior before he ever saw Doctor Tufo. Immediately prior to his first visit with Doctor Tufo, Adam had attempted suicide by cutting his left wrist. This behavior prior to his treatment gave Legion a reasonable basis to contest the Behns' assertion that it was Doctor Tufo's treatment that caused Adam's suicide.

Furthermore, there was a significant time gap between Adam's clinical relationship with Doctor Tufo and his eventual suicide. Doctor Tufo saw Adam for a period of just over six months, from February 27, 1990 to September 12, 1990. On or about September 17, 1990, Adam informed Doctor Tufo that he had changed to a more restrictive HMO and would be seeing another psychiatrist. It should be noted that Adam did not see another psychiatrist after his voluntary commitment at the Arbour Hospital from September 24 to September 27, but did see Mr. Markum, a substance abuse specialist. Adam did not commit suicide until January 29, 1991, about four-and-a-half months after terminating treatment with Doctor Tufo. There-

---

4. At trial, plaintiffs repeatedly raised the issue of Legion's failure to take Doctor Bursztajn's deposition. In Massachusetts state courts, however, taking expert depositions requires leave of court and is rarely done, even in medical malpractice cases. Furthermore, in state court the doctor who is named as an expert at the beginning of the case is often different from the doctor who testifies on the stand. Because this Court finds that Attorney Sullivan's reliance on Doctor Katz was reasonable, the Court does not find it unreasonable that she did not take Doctor Bursztajn's deposition.

fore, unlike many medical malpractice cases where the patient dies or is harmed while under the physician's care, Adam had long since ceased being treated by Doctor Tufo. This time gap gave Legion a reasonable basis to contest Doctor Tufo's liability for Adam's suicide.

Finally, Adam's death was a suicide, giving Legion a basis to contest that Doctor Tufo's treatment was the proximate cause of Adam's death. It was Adam's decision to ingest 50 Pamelor tablets on January 29, 1991, long after he stopped seeing Doctor Tufo. Although Adam chose to ingest 50 Pamelor tablets prescribed by Doctor Tufo, and not 50 tablets of any other drug from what his own family described as a massive stockpile of prescription and illegal drugs,[5] that does not make it clear that the suicide was proximately caused by Doctor Tufo's treatment. Even the Behns' insurance expert, Clinton Miller, admitted that Doctor Tufo's treatment was not the sole proximate cause of Adam's death.

The fact that the case was a suicide made it highly probable that the jury would find at least some comparative negligence, and in fact it found that Adam was 25 percent liable for his own death. Had the jury found Adam to be more than 50 percent liable, Legion would have had no financial responsibility under Massachusetts comparative negligence law. Therefore, the Court finds that Legion acted reasonably in raising this issue and refusing to settle as a result.

### (c) *Amount of Damages*

■ Furthermore, plaintiffs' original demand was well in excess of the policy limits and Legion's estimate of potential liability. If liability is contested as to *either* causation or *damages*, liability is not reasonably clear. *See Clegg*, 424 Mass. at 421, 676 N.E.2d 1134. Attorney Sullivan testified at trial that she believed damages would not be as high as plaintiffs' initial demand of $1,700,000, based on several considerations. One consideration was that Adam was in his mid–20s and worked as a photographer at the studio that his parents owned, where he made between $300 and $350 a week. Attorney Sullivan believed that his limited work history, coupled with his history of drug and alcohol abuse and out of control behavior, would reduce Adam's expected earning capacity. Adam was also unmarried and had no children, so there would be no consideration of the need to support a family. Furthermore, the fact that the case was a suicide meant that it was likely that the jury would find some comparative negligence, which would reduce any damages claimed and proved. The damages as articulated by Mr. Behn in his answers to interrogatories do not clearly delineate how $1,700,000 is the appropriate damage amount, and in fact do not use the figure $1,700,000 at all.[6] This Court finds that it was reasonable for Legion to dispute the amount of damages claimed, even when the Behns reduced their demand to $1,000,000 on the eve of trial. Therefore, liability was not "reason-

---

**5.** Although Mrs. Behn testified that she and Adam flushed what she then believed was all of his drug stockpile down the toilet in October, 1990, it is clear from the fact of the suicide that Adam retained some drugs without his family's knowledge. The fact that Doctor Tufo's medication survived the October, 1990 purge rather than some other medication does not make it clear that Doctor Tufo was at fault.

**6.** Mr. Behn's answer to interrogatory number two in the underlying case lists $8,839 in funeral expenses, $150,000 for loss of Adam's assistance in managing the family's photography studio, incalculable loss of services damages, $5,000 in medical expenses, and $3,000 in automobile expenses.

ably clear" within the meaning of Chapter 176D.

### (d) *Other Chapter 93A/176D Claims*

Since liability was never reasonably clear, this Court need not make findings as to whether Legion violated specific subsections of Mass.Gen.L. ch. 176D, § (3)(9). *Van Dyke*, 388 Mass. at 677–78, 448 N.E.2d 357. Nor was it improper for Legion to refuse to pay upon receipt of the Behns' Chapter 93A demand letter, as alleged in Count V. Furthermore, since liability was not reasonably clear, it was not improper for Legion to consider Doctor Tufo's refusal to consent to settlement in deciding not to make even a nominal settlement offer to dispose of the case.

### (2) *Intentional Infliction of Emotional Distress*

■■■■ In counts VII and VIII, the Behns assert claims for intentional infliction of emotional distress because Legion's actions in forcing them to go to trial in the underlying case caused them severe emotional trauma. To prevail on a claim of intentional infliction of emotional distress, the Behns must show that Legion intended to inflict emotional distress or acted recklessly in a manner it knew or should have known would cause emotional distress; that Legion's conduct was extreme and outrageous, beyond all bounds of decency, and utterly intolerable in a civilized society; and that Legion's actions caused severe distress to the Behns. *Nancy P. v. D'Amato*, 401 Mass. 516, 520, 517 N.E.2d 824 (1988); *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976). The Behns have failed to prove that Legion or its agents acted recklessly, or that Legion's conduct in failing to settle the underlying case was extreme or outrageous. Rather, the Court finds that Legion acted reasonably in trying the underlying case because it believed it had a reasonable chance of obtaining a defense verdict, or at least a finding of comparative negligence. Therefore, Legion did not intentionally or recklessly inflict emotional distress on the Behns.

### (3) *Breach of Contract*

■■■ In count VI, the Behns assert that Legion breached its insurance contract with Doctor Tufo, and therefore its obligation to the Behns as third-party beneficiaries. The Behns have never articulated specifically how the contract was breached. When the agreement for judgment between the Behns and Doctor Tufo was signed, Legion paid $1,000,000 to the Behns. Since the Court finds that there was no obligation to pay the policy limits prior to the agreement for judgment, because liability was never reasonably clear, the Court also finds that Legion did not breach any contractual obligation to the Behns.

### III. *CONCLUSION*

Liability in the underlying case was never reasonably clear. Therefore, Legion did not violate any section of Chapter 176D by failing to pay the Behns' claim against Doctor Tufo until after liability was established in court. Legion did not intentionally or recklessly cause emotional distress to the Behns, because it acted reasonably in refusing to pay a claim where liability was not reasonably clear. Finally, Legion's refusal to pay the claim when liability was not reasonably clear did not breach its insurance contract with Doctor Tufo and its obligation to the Behns as third-party beneficiaries.

Judgment shall be entered for defendant on all counts.

SO ORDERED